# IN THE SUPREME COURT OF THE STATE OF DELAWARE

KEVIN DIEP, derivatively on behalf of EL POLLO LOCO HOLDINGS, INC., §§§§§§

    Plaintiff Below, §
    Appellant, §

    v. §

TRIMARAN POLLO PARTNERS, L.L.C., §
    Defendant Below, §
    Appellee, §

    and §

EL POLLO LOCO HOLDINGS, INC., §
    Nominal Defendant Below, §
    Appellee. §

No. 313, 2021

Court Below: Court of Chancery of the State of Delaware

C.A. No. 12760

Submitted: March 30, 2022
Decided: June 28, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery of the State of Delaware: **AFFIRMED**.

Ralph N. Sianni, Esquire, ANDERSEN SLEATER SIANNI LLC, Wilmington, Delaware, Hung G. Ta, Esquire (*argued*), JooYun Kim, Esquire, Natalia D. Williams, Esquire, HGT LAW, New York, New York, and Peter Safirstein, Esquire, SAFIRSTEIN METCALF LLP, New York, New York, *for Plaintiff Below, Appellant Kevin Diep, derivatively on behalf of El Pollo Loco Holdings, Inc.*

Kurt M. Heyman, Esquire, Jamie L. Brown, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware, Adam H. Offenhartz, Esquire

(*argued*), GIBSON, DUNN & CRUTCHER LLP, New York, New York, and Tyler H. Amass, Esquire, GIBSON, DUNN & CRUTCHER LLP, Denver, Colorado, *for Defendant Below, Appellee Trimaran Pollo Partners, L.L.C., and Nominal Defendant Below, Appellee El Pollo Loco Holdings, Inc.*

**SEITZ**, Chief Justice, for the Majority:

El Pollo Loco is a fast casual Mexican-inspired restaurant chain specializing in fire-grilled, citrus-marinated fresh chicken and other dishes prepared in front of the customer. Kevin Diep, a stockholder of El Pollo Loco Holdings, Inc. ("EPL"), filed derivative claims against some members of EPL's board of directors and management, as well as a private investment firm. The suit focused on two acts of alleged wrongdoing—concealing the negative impact of price increases during an earnings call and selling EPL stock while in possession of material non-public financial information.

After the Court of Chancery denied the defendants' motion to dismiss, the EPL board of directors designated a special litigation committee of the board ("SLC") with exclusive authority to investigate the derivative claims and to take whatever action was in EPL's best interests. After a lengthy investigation and extensive report, the SLC moved to terminate the derivative claims. All defendants but the private investment firm settled with Diep while the dismissal motion was pending. The Court of Chancery granted the SLC's motion after applying the familiar two-step review under *Zapata Corp. v. Maldonado*.[1]

On appeal, Diep challenges the Court of Chancery's decision on several grounds. He contends that there were disputed issues of material fact concerning the

---

[1] 430 A.2d 779 (Del. 1981).

independence of the SLC members and the reasonableness of its investigation, the court abused its discretion when it found that the SLC's conclusions were reasonable, and the court erred when it applied the second prong of the *Zapata* test. After our review of the record, including the SLC's report, and the Court of Chancery's decision, we find that the court properly evaluated the SLC's independence, investigation, and conclusions, and we affirm the judgment of dismissal.

## I.

## A.

The background facts are drawn from the derivative complaint and the SLC's 2019 Report.[2] El Pollo Loco is a restaurant chain operating in the "quick service plus" or "QSR+" category.[3] According to EPL, its restaurants provide "fresh quality food, but with a fast casual dining experience" or, in other words, "speed, convenience, and value."[4] Founded in 1980 in Los Angeles, California, it expanded to many locations, and completed an Initial Public Offering on July 25, 2014.[5] Defendant Trimaran Pollo Partners, L.L.C. ("TPP") is an investment vehicle formed in 2005 by private asset management firm Trimaran Capital Partners ("Trimaran

---

[2] App. to Opening Br. at A6–112 (Diep's Compl.); App. to Answering Br. at B3–443 (hereinafter, the "SLC Report").
[3] App to Answering Br. at B16.
[4] *Id.*
[5] *Id.*

Capital") to acquire EPL's predecessor.[6] Dean Kehler, Andrew Heyer, and Jay Bloom founded Trimaran Capital. Kehler is one of two managing members of Trimaran Capital, and Trimaran Capital is the managing member of TPP. TPP membership is otherwise made up of Trimaran Capital affiliates, except for one member—private investment firm Freeman Spigoli & Co ("Freeman Spigoli"). On the EPL board, TPP was represented by Kehler, John Roth, and Michael Maselli. Roth is CEO of Freeman Spigoli and Maselli is a TPP managing partner. Maselli served as chairman of the EPL board.

After the IPO, TPP owned 59.2% of EPL's outstanding common stock. EPL then adopted an insider trading policy (the "Trading Policy") restricting stock sales by EPL insiders outside of specific trading windows.[7] The insiders under the Trading Policy included "directors, officers, employees and service providers" as well as "corporations or other business entities controlled or managed by" the former.[8] The Trading Policy prohibited the purchase and sale of EPL stock unless the party was "(1) . . . not aware of material non-public information . . . ; (2) the purchase or sale [fell] within the Trading Window . . . ; and (3) the trade was pre-cleared under the Company's mandatory pre-clearance policy" by EPL's chief legal

---

[6] *Id.* at B18.
[7] App. to Opening Br. at A614–627.
[8] *Diep v. Sather*, 2021 WL 3236322, at *2 (Del. Ch. July 30, 2021).

officer, Edith Austin.[9] The first trading window after the IPO opened May 19, 2015, and closed June 10, 2015. Austin notified the EPL insiders of the trading window on April 23, 2015 and reminded them that they were required to seek pre-clearance for trades.[10]

Ryan Hawley was EPL's vice president of marketing planning and analysis. His role included "develop[ing] and refin[ing] the Company's pricing strategy and . . . developing pricing recommendations."[11] Hawley created daily and weekly reports on EPL's performance and recommended price changes to the EPL executive management team. The reports included EPL's "key performance metric" of Same Store Sales or "SSS"—the year-to-year change in the number of transactions and the aggregate amount spent per transaction at each store.[12]

Hawley also tracked consumer response to price changes, in both sales and value perception. These perception reports included the overall value of the company—the experience divided by the price—and EPL's price competitiveness/value for money, drawn from consumer surveys. Given EPL's place in the QSR+ category, consumer perceptions were important to the overall

---

[9] App. to Opening Br. at A622.
[10] App. to Answering Br. at B218.
[11] *Id.* at B83.
[12] *Id.* at B8, B30, B87, B110.

business.  EPL historically looked to large-scale trends rather than specific market responses when evaluating the importance of value scores.[13]

B.

EPL increased food prices three times between 2014 and 2015.  The increases were a response to rising labor costs as well as a brand decision "to cover costs to drive top line sales[.]"[14]  Together, prices increased 3% across the menu, a change EPL had never implemented in just one year.[15]  In 2014 and the beginning of 2015, EPL had a larger than expected drop in sales, though revenue remained strong.

In April 2015, Hawley began preparing materials for the May 11–12 board meeting.  Various insiders, including then-director, president, and chief executive officer Stephen Sather, chief financial officer Laurance Roberts, chief marketing officer Edward Valle, then-chief operating officer Kay Bogeajis, and board chair Maselli, reviewed and commented on these materials and other draft presentations.

On May 5, 2015, Sather sent Maselli a customer survey showing a decline in EPL's value score from 59.6% to 58.1% between April and May.  The sample size was "less than 15.5% of the likely total responses for the month."[16]  Sather asked

---

[13] "Mr. Hawley explained that there had been 'many ups and downs' with respect to value scores: M9 2014 value scores were good, M10 2014 scores dropped, M1 2015 scores increased, and then M2 2015 declined again.  Mr. Hawley stated that 'the bigger concern' was the general trend over time, not any specific drop."  *Id.* at B139.

[14] *Id.* at B131.

[15] *Id.* at B128–29.

[16] *Id.* at B143.

Maselli to "keep this between us at this point as I don't want anyone to over react."[17] Maselli told the SLC "that he understood Mr. Sather's comment about keeping the data between them as being related to the fact that the report was a 'very early read,' and that he believed that Mr. Sather had wanted more data before sharing the data with others."[18] Meanwhile, the presentations were finalized and distributed to board members on May 6.

The EPL board, managing and non-managing executives, and representatives from Freeman Spigoli attended the May 11 meeting.[19] Roberts presented financial updates that showed a decline in SSS but explained that he felt EPL was still in a good place overall. He also presented a lower projected SSS for the second quarter of 2015 based on year-to-date sales. Apparently, there was no explanation given for the SSS decline, but management was optimistic that the 3rd and 4th quarters could compensate because the company had a plan to introduce new menu items.

Essentially the same group attended the May 12 session of the board meeting. For the most part, Hawley ran this meeting. His presentation had been updated since the May 6 draft and offered possible explanations for the SSS drop. Hawley explained that the first quarter issues could be attributed to the holidays, given the growth over the rest of the quarter, but that issues in amount-per-transaction were

---

[17] *Id.*
[18] *Id.*
[19] *Id.* at B146.

likely caused by the "2015 pricing action" which "had 'led to lower total sales.'"[20] He also pointed out a significant dip in the answer to the consumer survey question of whether EPL "provides good value for the money"—from 71% to 54% between 2014 and 2015.[21] During the meeting, the board and management team discounted the consumer survey analysis and the value scores because they were from a new, untested firm.[22] Hawley conceded that EPL was working with a new firm and the data could be wrong.[23]

EPL filed a Form 10-Q on May 14, 2015, reporting its first quarter earnings. Earnings failed to meet company forecasts. On an earnings call that evening (the "Earnings Call"), management gave a scripted presentation followed by a live Q&A. In drafting the presentation script, the management team discussed what they should disclose about the current quarter, which was also unlikely to meet forecasts. EPL had not typically disclosed information about quarters in progress. "Preparation for the Earnings Call thus included discussions regarding how much second-quarter forecasting to disclose to adequately 'manage the market's expectations' without

[20] *Id.* at B157–59.
[21] *Id.* at B161.
[22] For instance, Valle thought EPL had mistakenly prioritized steak and shrimp menu items, which were not as healthy as other EPL offerings and led to the dip in earnings.
[23] *Id.* at B161–64.

creating an expectation that the market would continue to receive such detailed forward-looking information 'forever.'"[24]

Hawley was involved in drafting the Q&A responses. He proposed answers about the link between EPL's increased pricing and decreased performance, as well as decreases in value score. Specifically, he included a projected second-quarter Company SSS range of 1.0–2.5% instead of the 2.5% number he had presented at the board meeting.[25] This range showed the possibility that the previous drops were not anomalies but instead due to general sales trends. Roberts did not include the specific range in his draft answers, instead offering language about a strong quarter in the previous year and marketing issues. He also edited the Q&A draft answer about the drop in value scores, saying it was due to the prioritization of certain menu items. After a management meeting on May 12, Hawley inserted the SSS ranges and specific forecasts into the draft, and suggested consumer pricing resistance as a response to questions about the decreased value score.[26] Hawley's comments were not included in the final draft.[27]

---

[24] *Diep*, 2021 WL 3236322, at *6 (quoting SLC Report at 193–94 (available at App. to Answering Br. at B207–08)).

[25] App. to Answering Br. at B198.

[26] *Id.* at B197–99 ("Mr. Hawley also proposed answers to questions about franchise versus company performance, Q1 comps, Houston restaurants, and whether there was 'any negative response from consumers to our price increases [and] any impact on value scores,' the last of which Mr. Hawley answered by noting that EPL was 'seeing some potential pushback from consumers on prices.'").

[27] *Id.* at B201–03; App. to Opening Br. at A924–31 (SLC Report Ex. 193).

The management team drafting the statement, conscious of the upcoming trading window, sent the draft script to outside counsel to make sure it would be "sufficient from an insider-trading standpoint."[28] The final version read on the Earnings Call revealed the likelihood that second quarter SSS would "be closer to the low end of the [previously projected] range," and attributed the drop to how strong the quarter had been the previous year (given that SSS reflected year-to-year changes from the same stores).[29] Management maintained a full-year SSS projection of 3–5%.

On the Earnings Call, a Morgan Stanley analyst asked about the earnings drop and value score decrease.[30] Roberts and Valle attributed the issues to the non-chicken proteins, and not "price resistance in the higher price points[.]"[31] Sather specifically touted EPL's value scores as consistently strong but did not mention the new scores received earlier that month.

C.

Maselli had been considering selling some of TPP's EPL stock in the upcoming trading window. On May 3, 2015, Maselli emailed Sather about a potential sale. He then met with EPL management before the May 11 board meeting

---

[28] App. to Answering Br. at B191.
[29] App. to Opening Br. at A932–44 (SLC Report Ex. 197 at 5).
[30] *Id.* at A940 (SLC Report Ex. 197 at 8).
[31] *Id.*

to discuss. On May 18, 2015, Wesley Barton, a Trimaran Capital vice president and EPL director, informed EPL's chief legal officer of the possible sale. Barton said that "TPP [was] considering a block sale of some stock" and that he "suspect[ed] that the c-level team [would] participate in the block with TPP."[32] Around the same time, Maselli emailed Bogeajis, Roberts, Valle, and Sather, requesting a "quick call to discuss the process for the possible share sale."[33] According to Maselli, the underwriters involved in the Block Trade had requested executive involvement to streamline the process and avoid a subsequent block sale that lowered the value of the first stock sale.[34] Sather, Valle, and Bogeajis each requested and received pre-clearance under the EPL Trading Policy from the chief legal officer. TPP did not request approval for its sale.

EPL's stock closed at $29.06 per share on May 14, 2015, the day of the Earnings Call. It opened on May 15 at $24.96 and continued to drop. On May 19, 2015, the first day of the first trading window since the IPO, the stock opened at $24.07. TPP, Sather, Valle, and Bogeajis sold stock that day (the "Block Trade"). As the managing member of TPP, Trimaran Capital negotiated the terms of the Block Trade, and its managing members Kehler and Bloom authorized the trade on behalf of Trimaran Capital and TPP. In total, they sold 5,962,500 shares for

---

[32] App. to Answering Br. at B222.
[33] Id.
[34] Id. at B221.

12

$130,280,625, or $21.85 per share.  The Block Trade sales were distributed as follows:

| Seller | Number of Shares | Proceeds |
| --- | --- | --- |
| TPP | 5,402,500 | $118,044,625 |
| Sather | 360,000 | $7,866,000 |
| Valle | 175,000 | $3,823,750 |
| Bogeajis | 25,000 | $546,250 |

Distributed among the TPP members, Trimaran Capital received $68,122,313, Freeman Spigoli received $39,010,728, and other members received $10,911,584. TPP held 16,746,544 shares of EPL stock after the Block Trade.  Other directors on the EPL board (Douglas Ammerman and Samuel Borgese) exercised purchase options and sold stock on May 19 separate from the Block Trade.

On August 13, 2015, EPL issued a press release announcing the results for the quarter ending July 1, 2015.  The press release stated that "system-wide comparable restaurant sales [SSS] grew 1.3%" while company SSS declined 0.5%, driven by a "3.9% decrease in traffic, partially offset by a 3.4% increase in average check size."[35] In the press release EPL adjusted its overall SSS projection for 2015 from 3–5% to

---

[35] *Id.* at B254.

"approximately 3.0%[.]"[36] EPL stock opened at $18.04 a share on August 13, 2015. It closed at $14.56 per share the next day. From the beginning to the end of 2015, EPL's stock price dropped 37%.[37]

D.

On August 24, 2015, Daniel Turocy, an EPL stockholder, filed a class action against EPL, Sather, Roberts, Valle, TPP, Trimaran Capital, and Freeman Spigoli in the U.S. District Court for the Central District of California. He alleged federal securities law violations for the Block Trade (the "Turocy Action"). On November 5, 2015, Armen Galustyan, another EPL stockholder, sued TPP, Sather, Roberts, Valle, Bogeajis, Maselli, Kehler, Barton, Ammerman, and Borgese in the Court of Chancery, alleging breach of fiduciary duty and unjust enrichment for the Block Trade (the "Galustyan Action"). The parties agreed to stay the Galustyan Action pending the outcome of the Turocy Action. The Court of Chancery later granted Galustyan's motion to dismiss his suit voluntarily with prejudice.

On September 20, 2016, Diep, another EPL stockholder, filed this action after obtaining books and records through a Section 220 demand. The complaint named Sather, Roberts, Valle, Bogeajis, Ammerman, Borgese, and TPP as defendants. The complaint contained two counts: first, that all defendants except Roberts breached

---

[36] *Id.*

[37] From $20 per share on January 2, 2015, to $12.63 per share on December 31, 2015. *Id.* at B260.

14

their fiduciary duties by making the Block Trade—an insider trading *Brophy v. Cities Service Co.* claim—and second, that Sather, Roberts, and Valle breached their fiduciary duties by making intentionally false public disclosures in the Earnings Call.[38]

All defendants responded with a multi-pronged motion—to stay in favor of the Federal Action, to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim, and to dismiss under Rule 23.1 for failure to make a demand (the "2016 Motion to Dismiss" or "2016 Motion").[39] Specifically, the defendants argued that Diep had failed to plead facts showing a substantial likelihood of liability for the majority of the Board. According to the defendants, the alleged non-public information was disclosed publicly, the intra-quarter results were immaterial, and there was no showing of scienter.[40]

The defendants also claimed that similar defects existed in Diep's claim for relief, because the complaint did not contain "specific supporting factual allegations."[41] The 2016 Motion was filed on behalf of "Nominal Defendant El Pollo Loco Holdings, Inc." and defendants Bogeajis, Roberts, Sather, Valle,

---

[38] 70 A.2d 5 (Del. Ch. 1949); *Malone v. Brincat*, 722 A.2d 5 (Del. 1998).
[39] *Diep*, 2021 WL 3236322, at *10; App. to Opening Br. at A113–A175 (Defendants' Brief in Support of Their Motion to Stay or to Dismiss Pursuant to Rules 23.1 and 12(b)(6)).
[40] App. to Opening Br. at A117, A160–72.
[41] *Id.* at A173 (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

Ammerman, Borgese, and TPP.[42] The Court of Chancery stayed the count addressing the statements made during the Earnings Call in favor of the Turocy Action (given the potential to recover and California's interest in the matter), but denied the motions with respect to the insider trading claims. According to the court, "the plaintiffs [had] plead that it is reasonably conceivable that the executives did give knowingly false and misleading answers about the cause for the slowdown and that they subsequently traded, along with the controlling stockholder, before the full information was known by the market."[43] The court held that Delaware's interest in the matter—protecting the fiduciary relationship—"is a quintessential Delaware law concern" and refused to stay because stockholders would not benefit from the Turocy Action.[44]

Turning to the Rule 12(b)(6) motion, the court found Diep had successfully pled a possible *Brophy* claim by identifying instances where Sather, Roberts, and Valle had said that higher prices had not influenced SSS, instead pointing to timing, marketing, or brand messaging.[45] Diep had demonstrated there was "a serious problem . . . a serious risk" with price increases at the time, as shown in later EPL materials which confirmed issues with pricing.[46] And while the defendants had

---

[42] *Id.* at A114–15.
[43] *Diep v. Sather*, C.A. No. 12760, at 89 (Del. Ch. Mar. 17, 2017) (TRANSCRIPT).
[44] *Id.* at 94.
[45] *Id.* at 103.
[46] *Id.* at 105.

16

claimed there was no scienter pled, the Court of Chancery held that "knowledge can be alleged generally under Rule 8."[47] The other circumstances surrounding the Block Trade, while not determinative, supported an inference of scienter at the pleading stage. As such, the Rule 23.1 motion was dismissed because Diep had shown that five of nine directors faced a substantial likelihood of liability.[48]

E.

After the Court of Chancery denied the motions to dismiss, the EPL board formed the SLC to investigate the allegations in all three suits, as well as demands for suit from other EPL stockholders. The EPL board appointed three directors to the SLC—Douglas Babb, William Floyd, and Carol Lynton. All three newly appointed directors joined the board after the 2015 events at issue in the derivative action.

1.

Babb, an attorney, served in executive positions for various companies, more recently in the healthcare industry and previously in the transportation industry.[49] Babb and Floyd worked together before Babb joined the EPL board.[50] Floyd was the one who recommended him to serve as an outside director. When interviewing

---

[47] *Id.* at 107.

[48] *Id.* at 109–10.

[49] App. to Answering Br. at B34–35.

[50] "From 2001 to 2006, Mr. Floyd was Chairman and Chief Executive Officer at Beverly Enterprises, and Mr. Babb reported to him as Executive Vice President-Chief Administrative and Legal Officer and Secretary from 2002 to 2006." *Id.* at B35.

for the board position, Babb reviewed pending litigation against EPL and discussed the suits with Lynton and others. It was mentioned during the board interview process that he would likely join the SLC.[51] He joined the board on January 3, 2018, and the SLC on January 11, 2018.

2.

Floyd served as chairman and in executive positions for various businesses, including businesses in the restaurant and fast-food industries. He was also a member of the Board of Overseers at the University of Pennsylvania School of Nursing. Before joining the board, Floyd knew Kehler through the Board of Overseers, where the two served together.[52] The Board of Overseers meets three or four times a year and has thirty members. Kehler recruited Floyd to join the board of directors "because [EPL] was seeking independent board members to meet federal and agency requirements for public companies."[53] Floyd discussed pending litigation with Kehler but did not raise the possibility of joining the SLC until after Floyd joined the board. When Kehler recruited Floyd to the board, Kehler told Floyd "three things [about the pending litigation]. He said we did nothing illegal, we did nothing unethical, but he said the optics did not look good with the, you know, with

---

[51] *Id.*

[52] Floyd also knew Sather and Bogeajis when the three worked at Taco Bell but had limited relationships with both individuals.

[53] *Id.* at B37.

18

the trading of the stock."[54]  Floyd joined the board on April 1, 2016, and the SLC on October 6, 2017.

3.

Lynton was a co-founder, executive, and director for various restaurant groups, based primarily in New York.  As with Floyd, Kehler recruited Lynton to join the board "because [EPL] was seeking independent board members to meet federal and agency requirements for public companies."[55]  In the interview process, Kehler and Lynton discussed the litigation pending against EPL, but the possibility of an SLC was not raised until after Lynton joined the board.

Lynton attended Harvard College with Kehler's wife, where they met two or three times.  From 1983 to 1985, Lynton, Kehler, and Kehler's wife all worked for Lehman Brothers.  Lynton and Kehler's wife were junior analysts and Kehler was a senior associate and vice president.  Lynton briefly worked with Kehler at this point, primarily on a two-week project.

Since their time in the 1980s at Lehman Brothers, Lynton has dined with the Kehlers about twenty times, including once at Lynton's mother's home.  Her eldest daughter briefly went to the same high school as the Kehlers' eldest son.  Lynton characterized her social activities with the Kehlers as primarily related to their

---

[54] App. to Answering Br. at B469–70 (Floyd Depo. Tr. 10–11).
[55] *Id.* at B39.

19

children, who are now adults.[56]  Since joining the EPL board, Lynton has dined with Kehler's wife twice.  Lynton and Kehler have also donated what could be characterized as small amounts to non-profits that the other was involved in, and Lynton once asked Kehler and two other individuals for business advice about ten years ago.  Lynton joined the EPL board on April 1, 2016, and the SLC on October 6, 2017.

For their SLC service, the members were paid $4000 a month, plus expenses—an amount in line with remuneration of SLC members appointed by other companies.[57]  The SLC members also agreed to surrender their SLC-related compensation or have the court adjust the amount received if their compensation was found by the court to be unreasonable or to impair their impartiality or independence.

F.

The Court of Chancery stayed the suit while the SLC went to work.  The SLC undertook an extensive investigation.  It hired counsel whose independence has not been challenged.  It reviewed over 249,000 documents that included board materials, financial updates and reports, internal governance and policies, and business and personal emails about the Board Presentation, the Management Presentation, and the

---

[56] *Id.* at B40, B50.
[57] *Id.* at B41, 53.

Block Trade.[58] It also reviewed deposition transcripts from other litigation and conducted interviews with all potential defendants and key EPL employees, including Hawley. Diep's counsel and counsel for other stockholders were invited to participate in the investigation but, unfortunately, did not cooperate with the SLC.[59]

The SLC met formally sixteen times between December 2017 and February 2019 and consulted with its counsel throughout the investigation. It finalized its conclusions and published its report on February 13, 2019 (the "SLC Report"). In its 377-page report, the SLC considered 1) the merits of the claims; 2) the cost of potential litigation; 3) how distracting litigation would be to the company; and 4) the reputational challenges and costs to public relations.[60]

Diep had pled a *Brophy* claim against the defendants for insider trading. A *Brophy* claim requires 1) that there existed material, nonpublic information and 2) evidence that the parties were motivated to trade by the information.[61] The SLC determined that Hawley's information was not material because it was an early, sample-size estimate and because various other theories were presented at the same

---

[58] *Id.* at B63–64.

[59] *Id.* at B66–77.

[60] *Id.* at B387–390.

[61] *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011) (*Brophy* requires "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." (quoting *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005) (ORDER))).

time.[62] The management team had also proactively disclosed on the Earnings Call the earnings results and the potential that the SSS would be lower than anticipated. In the SLC's view, this made any material information public, as shown by the drop in stock price after the Earnings Call.[63]

The SLC also found that there was insufficient evidence of scienter. The Block Trade took place on the first day of the trading window. Because the defendants had taken the first possible opportunity to sell stock, it was less likely that the sale was a calculated effort to benefit from inside information.[64] And the EPL board and management viewed Hawley's analysis as more of a contrary point of view rather than a definitive determination of value perception.[65] As such, the SLC concluded, it was unlikely that they were motivated to trade by that information.[66]

Diep and the other plaintiffs had also alleged breaches of fiduciary duty by Sather, Roberts, Valle, and TPP. Specifically, Diep contended that their failure to

---

[62] App. to Answering Br. at B276–77; *id.* at B285–89.

[63] *Id.* at B304–26.

[64] *Id.* at B351–52 ("[Maselli] stated that the 'norm' is to sell early in the open window because the disclosure is 'freshest' and the best data is available to the market. Thus, the timing of the Block Trade—the first day of the trading window on May 19, 2015—does not suggest an ulterior motive, but is consistent with the usual practice of private equity firms.").

[65] *E.g.*, *id.* at B283 ("Mr. Kehler, among other individuals interviewed by the SLC, said that he believed Mr. Hawley's value score slides were part of a narrative to raise warning signs about pricing. Moreover, Mr. Kehler suggested that Mr. Hawley's presentation of the survey data was 'intentionally misleading' and designed to 'soften up' the Directors and Executive Management Team to lower prices.").

[66] *Id.* at B347–56 (discussing whether there was a viable *Brophy* claim against the TPP representatives).

disclose material information on the Earnings Call "breached their fiduciary duties of loyalty and good faith by engaging in stock sales while in possession of purportedly material, nonpublic information."[67] And Diep also argued that Sather, Roberts, and Valle "'breached their fiduciary duties, including their duty of candor,' by purportedly making untrue statements and by failing to provide material facts."[68] EPL's certificate of incorporation contained an exculpatory provision, meaning that directors would only be liable if they "(i) engaged in intentional misconduct; (ii) committed a knowing violation of law; or (iii) acted in bad faith."[69] With respect to management, the SLC had to determine whether the directors were grossly negligent or had acted in bad faith, given that they were not exculpated from the duty of care.

The SLC found "that the Executive Management Team was well informed, acted in good faith, and was not grossly negligent in" not disclosing "potentially unreliable value score data" and SSS projections.[70] It also determined that the disclosures were "adequate in light of the information available to the Company during the Relevant Period."[71] Finally, the SLC found that, for all defendants, there was no "evidence of bad faith, intent to violate the law, failure to implement internal controls, or a conscious disregard of their corporate oversight duties[.]"[72] Among

---

[67] *Id*. at B357.
[68] *Id.*
[69] *Id.* at B261–62.
[70] *Id.* at B359.
[71] *Id.*
[72] *Id.* at B369.

other evidence, the SLC considered the decision to settle the Turocy Action and concluded that the Turocy Defendants settled "not because they believed the allegations had merit, but because of the risks inherent in potentially proceeding to trial and the significant costs that would be incurred in doing so."[73] The SLC concluded "that the Company should move to dismiss" the instant matter and should "not pursue litigation nor otherwise take any further action against any of the Defendants[.]"[74]

## G.

The SLC moved to terminate the litigation (the "SLC Motion to Dismiss" or "SLC Motion"). Before the Court of Chancery reviewed the motion, Diep and the individual defendants settled for $625,000 in exchange for a release. TPP was therefore the only remaining defendant. In his opposition to the SLC's motion, Diep challenged the SLC's independence and the reasonableness of its investigation. He argued that the SLC was not independent because Floyd and Lynton were conflicted, and that there were material questions of fact as to the SLC's conclusions. Diep argued in the alternative that the Court of Chancery should apply its own business judgment and find that even if there was a reasonable, good faith investigation, Diep pled claims that should be pursued in the best interests of the company.

---

[73] *Id.* at B61 n.319.
[74] *Id.* at B391.

24

The Court of Chancery reviewed Diep's objections "under a 'procedural standard akin to a summary judgment inquiry.'"[75] It first considered whether the directors' ties to the defendants rendered them, "*for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind," focusing on "impartiality and objectivity."[76] As part of its analysis, the court examined the relationships of the SLC members with the defendants, and whether they were "of such a nature that they might have caused [the SLC] to consider factors other than the best interests of the corporation in making their decision to move for dismissal."[77]

Diep did not challenge Babb's independence. With respect to Floyd and Lynton, Diep claimed that "they prejudged Plaintiff's claims by filing a motion to dismiss this action in 2016, and [] that each lacked independence from Kehler."[78] The Court of Chancery disagreed. The only evidence that Floyd and Lynton had familiarity with the motion to dismiss was Floyd's testimony that "no one on the Board [had] objected to the filing."[79] The Court of Chancery viewed Diep's argument as essentially that being a board member when the motion was filed made the SLC directors conflicted, an argument with "no support in Delaware law."[80] The

[75] *Id.* (quoting *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 928 (Del. Ch. 2003)).
[76] *Id.* at *15 (quoting *Oracle*, 824 A.2d at 938) (emphasis in original).
[77] *Id.* (quoting *London*, 2010 WL 877528, at *13) (alteration in original).
[78] *Id.*
[79] *Id.* at *16 (citing Floyd Dep. Tr. at 66, App. to Answering Br. at B482).
[80] *Id.*

court also looked to the tone of the SLC Report, which it found was "even-keeled and unbiased, suggestive of a fair investigation[.]"[81]

The Court of Chancery then turned to Floyd and Lynton's relationships with Kehler. The court found that Floyd and Kehler primarily interacted through the Pennsylvania Nursing School's Board of Overseers, which only met occasionally and had many members. This, the court held, was "plainly not enough to impugn Floyd's independence."[82] The court also examined the statements Kehler made to Floyd while recruiting him to the EPL Board and held that, compared with Floyd's extensive testimony, there was "no basis to conclude that Kehler's conclusory statements to Floyd would have caused Floyd to prejudge the merits of the litigation."[83] The SLC, the court concluded, had shown Floyd's independence.

Although Lynton's independence presented a closer call, the court reviewed the personal ties described earlier and observed that "[t]o meet its burden, the SLC must establish that Lynton's relationship with the Kehlers would not have biased Lynton in her investigation of the claims against Pollo Partners."[84] The court observed that our courts have recognized that social ties are not as strong as familial ones, and Lynton's role in the industry gave her "a reputational incentive to act

---

[81] *Id.*
[82] *Id.* at *17.
[83] *Id.*
[84] *Id.* at *18.

independently."[85]  Moreover, the court found that because the social ties of the directors were centered around the directors' children, they did not create a "sense of obligation" and were "unlikely to result in the type of awkward post-investigation encounters that would weigh on a director's decision-making during the course of the SLC's investigation."[86]  Finally, the charitable contributions, given their relatively small size, would not compromise Lynton's independence.  The Court of Chancery concluded that the SLC had established Lynton's independence, and there was no genuine dispute of material fact as to the independence of any of the SLC directors.

The court looked next at whether the SLC had "conducted a reasonable investigation of the matters alleged in the complaint in good faith."[87]  Diep had two primary grounds for objection: the SLC's failure to consider settlements and scienter on the part of TPP.  The Court of Chancery first determined that the SLC had considered the Turocy Action and concluded that the SLC could have reasonably decided that non-legal business decisions led the parties to settle.  The court also found that the SLC could not have considered the settlement in the instant case with

---

[85] *Id.*
[86] *Id.* (quoting *London*, 2010 WL 877528, at *15).
[87] *Id.* at *19 (quoting *Kaplan v. Wyatt*, 484 A.2d 501, 507 (Del. Ch. 1984), *aff'd*, 499 A.2d 1184 (Del. 1985)).

27

the individual defendants because it took place over a year after the SLC finalized its report.

Regarding scienter, the court found that the SLC had conducted a full and comprehensive investigation of the materiality of the information, the scienter of the defendants, and the violation of the Trading Policy, all aspects Diep had alleged were insufficiently considered. The court also found that the SLC had reasonable bases for its conclusions. As the court held, the SLC considered Hawley's statements, including "statements discounting a correlation between value scores and pricing increases" and came to the conclusion that he "had been, in effect, providing his own point of view throughout his portion of the [Management Presentation]."[88] And the SLC noted that the recipients of Hawley's reports did not ascribe certainty to the reports as they did with his formal quarterly forecasts. Hawley himself had concluded the lower sale numbers were early data and might not be indicative of longer-term trends. While it was possible to view the evidence in a different light than the SLC had, the court held that this did not render the SLC Report devoid of reasonable bases.

As for consciously making material misstatements on the Earnings Call, Diep had alleged only misstatements against individuals, not TPP. The court found that

---

[88] *Id.* at *22 (quoting SLC Report at 154 (available at App. to Answering Br. at B168); and citing *id.* at 151 (available at App. to Answering Br. at B165)) (alteration in original).

"[n]o Pollo Partners representatives participated in the Earnings Call where information was purportedly 'affirmatively concealed'" and thus could not be liable for a breach of a fiduciary duty.[89] Nevertheless, the SLC concluded that, because Hawley's forecasts were only estimates, not disclosing a specific SSS range on the call was within the discretion of the EPL board and management team. The Court of Chancery also agreed with the SLC's determination that the sale in the trading window did not support scienter because of TPP's private equity investment goals and the fact that the trading window was the first selling opportunity.

Finally, the Court of Chancery reviewed the SLC Motion under the second step of *Zapata* to decide "whether the SLC's recommended result falls within a range of reasonable outcomes that a disinterested and independent decision maker for the corporation, not acting under any compulsion and with the benefit of the information then available, could reasonably accept."[90] According to the court, the extensive, well-reasoned SLC Report and the scope of the investigation led to the conclusion that the SLC's decision was reasonable. Specifically, the court concluded, "[o]nly the Brophy claim of Count I is asserted against [TPP]. That claim requires a showing of scienter. The SLC directly addressed the facts on which Plaintiff relies to support

---

[89] *Id.*

[90] *Id.* at *23 (quoting *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 468 (Del. Ch. 2013); and citing *Obeid v. Hogan*, 2016 WL 3356851, at *12 n.14 (Del. Ch. June 10, 2016)) (footnote omitted); *Zapata*, 430 A.2d 779.

a finding of scienter and concluded that they offered little support."[91]  The court found that the SLC's conclusion not to pursue a "weak *Brophy* claim" against TPP was reasonable because it was "not worth the expense of protracted and uncertain litigation."[92]  It therefore granted the SLC Motion to Dismiss.

Diep has appealed the Court of Chancery's application of the *Zapata* analysis. On appeal, "*Zapata*'s first prong is subject to a summary judgment standard, our review of which is *de novo*.  Because *Zapata*'s second prong implicates the Court of Chancery's business judgment, we review for an abuse of discretion."[93]  We review the Court of Chancery's "legal conclusions *de novo*."[94]

## II.

The "business and affairs" of a Delaware corporation are managed by or under the direction of its board of directors.[95]  An important aspect of a board's managerial decisions is whether to initiate, or refrain from initiating, litigation on the corporation's behalf.[96]  Like a fleet of trucks or a factory, a lawsuit is a corporate asset that must be managed by the board consistent with its fiduciary duties.[97]

---

[91] *Diep*, 2021 WL 3236322, at *23.
[92] *Id.* at *24.
[93] *Kahn*, 23 A.3d at 840–41 (first citing *Williams v. Geier*, 671 A.2d 1368, 1375 (Del. 1996); then citing *Neponsit Inv. Co. v. Abramson*, 405 A.2d 97, 100 (Del. 1979)).
[94] *Id.* at 836 (citing *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011, 1015 (Del. 2007)).
[95] 8 *Del. C.* § 141(a).
[96] *Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996).
[97] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

30

While the board typically controls litigation on the corporation's behalf, "a stockholder is not powerless to challenge director action which results in harm to the corporation."[98]  As this Court stated in *Aronson v. Lewis*:

> The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management.  The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it.  The nature of the action is two-fold.  First, it is the equivalent of a suit by the shareholders to compel the corporation to sue.  Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it.[99]

To strike a balance between the "managerial freedom of directors" and a stockholder's desire to police the conduct of her fiduciaries, a stockholder must, before filing a derivative suit, "(1) make a demand on the company's board of directors or (2) show that demand would be futile."[100]  A stockholder who makes a demand concedes that the board as a whole is capable of considering a demand.[101]

---

[98] *Id.*

[99] *Id.*

[100] *United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) (*Zuckerberg II*) (cleaned up). *See Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) ("The demand requirement serves a salutary purpose. First, by requiring exhaustion of intracorporate remedies, the demand requirement invokes a species of alternative dispute resolution procedure which might avoid litigation altogether."); *Aronson*, 473 A.2d 805, 812 ("Thus, by promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations."); Ct. Ch. R. 23.1.

[101] *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 74 (Del. 1997) ("If the stockholders make a demand, as in this case, they are deemed to have waived any claim they might otherwise have had that the board cannot independently act on the demand."); *Grimes*, 673 A.2d at 1218–19 ("If a demand is made, the stockholder has spent one—but only one—'arrow' in the 'quiver.'  The

After receiving a demand, the board can establish a demand review committee to conduct a review of the demand proportional to the nature and strength of the claims and decide whether it is in the best interests of the corporation to pursue the claims. If the demand review committee investigates and concludes that the demand should be refused, an independent and disinterested demand review committee decision is accorded a business judgment standard of review. A plaintiff claiming wrongful demand refusal must raise a reasonable doubt about "the good faith and reasonableness of [the board's] investigation."[102]

If the stockholder files a derivative action without first making a demand on the board, and the board contests whether demand is futile, the court must review on a director-by-director basis:

(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is

---

spent 'arrow' is the right to claim that demand is excused."). The concession is limited to the board's ability to consider the demand. The stockholder does not waive the right to challenge on independence and disinterestedness grounds the board's disposition of the demand. *Grimes*, 673 A.2d at 1219. The *Scattered* and *Grimes* decisions were overruled on grounds not pertinent here. *See Brehm*, 746 A.2d at 253–54 (overruling prior precedent that the Court of Chancery's decision under Rule 23.1 is reviewed by the Supreme Court under an abuse of discretion standard).

[102] *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990); *see also Grimes*, 673 A.2d at 1219 ("If a demand is made and rejected, the board rejecting the demand is entitled to the presumption of the business judgment rule unless the stockholder can allege facts with particularity creating a reasonable doubt that the board is entitled to the benefit of the presumption.").

the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[103]

Here we deal with the "demand excused" paradigm, where the Court of Chancery found at the motion to dismiss stage that it was reasonably conceivable that members of the board misled the public and traded on material nonpublic information. The court also decided that, as pled, a majority of the EPL board received a material benefit from the alleged misconduct and faced a substantial likelihood of liability.[104]

Although the Court of Chancery gave the green light for the litigation to proceed at the stockholder's direction, the conflicted board had one final arrow in its quiver to gain control of the derivative litigation—the special litigation committee. Unlike a demand review committee formed in response to a stockholder demand, the special litigation committee typically comes into existence after demand is excused. The board can appoint independent and disinterested board members to the SLC to investigate and decide what action should be taken to address the litigation.

---

[103] *Zuckerberg II*, 262 A.3d at 1058.
[104] *Diep*, C.A. No. 12760, at 89 (TRANSCRIPT) ("In my view . . . the plaintiffs have been able to plead that it is reasonably conceivable that the executives did give knowingly false and misleading answers about the cause for the slowdown and that they subsequently traded, along with the controlling stockholder, before the full information was known by the market."); *id.* at 109–10 (finding Sather, Ammerman, and Borgese "face[d] a substantial risk of liability for a breach of the duty of loyalty, again, under a pleading-stage analysis. Three other directors are affiliated with Trimaran Pollo Partners, which is the company's controlling stockholder and a major seller . . . [and that Maselli, Kehler, and Roth] are insiders of the controller when the controller unloaded shares. So that is five of nine. That means that demand is futile.").

In *Zapata*, the Court recognized that a conflicted board appoints the SLC, and the SLC is charged with scrutinizing the conduct of the board members who have appointed them.[105] If the SLC then moves to dismiss the derivative litigation, it is not a typical motion to dismiss. The motion "is addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself."[106] In this atypical procedural posture, the SLC motion to dismiss is treated as a hybrid under Court of Chancery Rules 41(a)(2) and 56. To terminate derivative litigation, the SLC must show, and the court must be satisfied, that no disputed issues of material fact exist about the independence, good faith, and reasonableness of the SLC's investigation and whether the SLC had reasonable bases for its conclusions. As a second discretionary step, the court can review, in its business judgment, whether litigation dismissal or some other course of action proposed by the SLC is in the corporation's best interests.[107]

## A.

For the first prong of the *Zapata* two-step analysis:

the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. . . . The corporation should have the burden of proving independence, good

---

[105] *Zapata*, 430 A.2d at 786 (citing 8 *Del. C.* §§ 141(a), (c)).
[106] *Kaplan*, 484 A.2d at 507.
[107] *Zapata*, 430 A.2d at 787–89 ("If, however, the Court is satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations, the Court may proceed, in its discretion, to the next step.").

faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness. If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion.[108]

In most challenges to director independence, the court must confront the personal and professional relationships between those who judge and those being judged. Directors have relatives and friends. They have acquaintances who may be classmates, professional associates, or business contacts. They hold memberships in clubs and other organizations and have political affiliations. They own property, make financial investments, and have other business activities. It is a fact of life that "business dealings seldom take place between complete strangers" and "it would be a strained and artificial rule which required a director to be unacquainted or uninvolved with fellow directors in order to be regarded as independent."[109]

Given the common personal and professional relationships between board members, the independence question "is a fact-specific determination made in the context of a particular case."[110] Under *Zapata*, a director is independent "when he is in a position to base his decision on the merits of the issue rather than being

---

[108] *Id.* at 788–89.

[109] *Sutherland v. Sutherland*, 958 A.2d 235, 241 (Del. Ch. 2008) (quoting *In re Oracle Sec. Litig.*, 852 F.Supp. 1437, 1442 (N.D. Cal. 1994)).

[110] *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

governed by extraneous considerations or influences."[111]  In other words, the court

must ask whether the SLC member would be more willing to risk her reputation than

the personal or professional relationship with the director subject to investigation.[112]

Thus, "[t]he composition and conduct of a special litigation committee . . . must be

such as to instill confidence in the judiciary and, as important, the stockholders of

the company that the committee can act with integrity and objectivity."[113]

For the EPL SLC, it was undisputed that Babb was independent, and the Court

of Chancery found that Floyd and Lynton had not prejudged the merits of the suit by

serving on the board when EPL filed its motion to dismiss the derivative suit.  The

court also held that the SLC demonstrated that the business and personal connections

between the two SLC members and Kehler did not impact their independence or the

reasonableness of the SLC's conclusions.  Finally, the court held that the SLC

conducted a reasonable investigation and had reasonable bases for its conclusions.

On appeal, Diep challenges each of the Court of Chancery's findings.  We address

his arguments in turn.

---

[111] *Kaplan*, 499 A.2d at 1189.

[112] *Beam*, 845 A.2d at 1052.

[113] *Oracle*, 824 A.2d at 940.  In the dissent, our colleague states that the SLC members must be "above reproach."  The "above reproach" and "Caesar's wife" descriptions come from a decision referring to a single member SLC.  *See Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985) ("If a single member committee is to be used, the member should, like Caesar's wife, be above reproach.").  Although the Court in *Beam v. Stewart* quoted from *Lewis*, the Court also made clear in *Beam* that "[w]e need not decide whether the substantive standard of independence in an SLC case differs from that in a presuit demand case."  *Beam*, 845 A.2d at 1055.

36

## 1. Independence

Diep argues that Floyd and Lynton, as EPL board members, prejudged the merits of the investigation when EPL moved to dismiss Diep's claims for failure to state a claim. In other words, as members of a board that controls EPL's litigation decisions, the two SLC directors authorized EPL to take the litigation position that the derivative claims were without merit before the SLC was formed.

As noted earlier, "[i]ndependence is a fact-specific determination made in the context of a particular case."[114] In the demand futility context, directors have been held to be independent despite being defendants in litigation and filing motions to dismiss the claims against them.[115] If that was not possible, a few stockholders could "incapacitate an entire board of directors merely by leveling charges against them[.]"[116] The qualifier is, of course, that the board member defendants must not face a substantial likelihood of personal liability for their conduct.[117]

---

[114] *Beam*, 845 A.2d at 1049.

[115] *E.g.*, *Aronson*, 473 A.2d at 810 (noting that because futility is judged at the time a derivative suit begins, a motion to dismiss by the board does not create a conflict); *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993) ("the appropriate inquiry is whether Blasband's amended complaint raises a reasonable doubt regarding the ability of a majority of the Board to exercise properly its business judgment in a decision on a demand had one been made at the time this action was filed.").

[116] *Zapata*, 430 A.2d at 785 (quoting *Lewis v. Anderson*, 615 F.2d 778, 783 (9th Cir. 1979)).

[117] *Rales*, 634 A.2d at 936 (distinguishing between "mere threat" and "substantial likelihood" of liability in determining independence in ruling on a Rule 23.1 motion (quoting *Aronson*, 473 A.2d at 815)); *Katell v. Morgan Stanley Grp., Inc.*, 1995 WL 376952, at *7 (Del. Ch. June 15, 1995) (holding a defendant in a lawsuit facing potential liability could determine whether to pursue the suit as an SLC member). While our colleague in dissent says that "the SLC process is not necessarily unavailable where an entire board is named in a lawsuit and moves to dismiss it," Dissent at 27, it is hard to square the words "above reproach" and "Caesar's wife" with anything

37

While the procedural posture of the demand futility context is different than the SLC context, Diep has not raised a disputed issue of material fact showing the two SLC directors prejudged the merits of the litigation when EPL as nominal defendant joined in the motion to dismiss. The record does not show that Floyd and Lynton approved or participated in a substantive way in the decision to file the motion on EPL's behalf. As explained next, at most, the record shows they attended a board meeting when the motion was discussed.

The board minutes of October 31 and November 1, 2016 show that the board granted signatory authority for various matters, scheduled upcoming meetings, and received an audit committee update.[118] Sather and Roberts presented on business and financial matters, Austin provided an update regarding "pending litigation," and the meeting adjourned.[119] The minutes do not mention the motion to dismiss. While our colleague in dissent argues as a "logical conclusion" that the board "at least tacitly approved and authorized filing the 2016 Motion after that discussion," the record does not support tacit approval or authorization of anything. Although

other than a lack of independence in that situation. Our point is not to lessen the independence inquiry for SLC members. The point is to recognize that those words came from a case involving a single member SLC and these descriptions are not always helpful to decide the independence inquiry. The Court has never required that board members named as defendants appoint new board members to serve on an SLC to meet the independence requirement. As we stated in *Beam*, the independence inquiry should be treated as a "fact-specific determination made in the context of a particular case." *Beam*, 845 A.2d at 1049.

[118] Attach. to Diep's Letter, Apr. 4, 2022.

[119] *Id.* at 4–5.

Lynton attended the meeting, the record is devoid of evidence that Lynton was involved in any discussion about, or approved the filing of, the motion to dismiss. As to Floyd, he testified at his deposition that he was "sure" there "would have" been a "litigation update" and "discussion" on the subject, but "did not recall the details of it."[120] Although he did not recall anyone objecting to the motion, he did not say that he "approved" its filing. Instead, he testified that:

> As a member of the board, I don't recall whether it was put to a formal vote, how it was handled, but I don't -- I don't remember any details that -- of getting into depth about this at the board meeting.[121]

At best, what can be said about the pending litigation discussion and the motion to dismiss is that the motion was discussed as part of the litigation review, it was not discussed in depth, and Floyd does not remember anyone objecting to the motion. In our view, these facts do not raise a material question of fact about whether Floyd and Lynton prejudged the merits of the suit because they were exposed to a litigation review that included a less than in-depth discussion of the motion to dismiss.

Diep relies heavily on *London*, where the Court of Chancery found that directors had prejudged a lawsuit against the company. There, the court found the SLC directors had significant "prior exposure" and "familiarity" with the issues

---

[120] App. to Answering Br. at B481–82.
[121] *Id*. at B482–83.

because they sat on an audit committee that reviewed valuations related to the alleged wrongdoing.[122] The directors also characterized their committee actions as an "attack" on those valuations—and therefore the merits of the underlying litigation.[123] The Court of Chancery concluded: "Given the SLC members' relationships to [the alleged wrongdoer], their exposure to the merits of plaintiffs' suit well before the SLC was formed, and the unsatisfactory scope of the investigation conducted, the court was not convinced that the SLC was independent."[124]

The facts here are starkly different. The directors did not express hostility towards Diep's claims, nor does Diep claim that they formed any opinion about the claims. Mere familiarity with an issue does not compromise independence.[125] Like the Court of Chancery, we are satisfied that the SLC demonstrated there are no issues of material fact about whether Floyd and Lynton had prejudged the merits of the derivative complaint when the board caused EPL to join the motion to dismiss.[126]

---

[122] *London*, 2010 WL 877528, at *15.

[123] *Id.* at *16.

[124] *Id.*

[125] *See Katell*, 1995 WL 376952, at *10 (holding that prior knowledge of the deals at issue did not show a prejudgment of the issues).

[126] *See also* Stephen A. Radin, The Business Judgment Rule 4776 n.6704 (6th ed. 2009); *Strougo ex rel. The Brazil Fund, Inc. v. Padegs*, 27 F. Supp. 2d 442 (S.D.N.Y. 1998) (holding that SLC members who participated in a Rule 12(b)(6) motion while on the board were independent); *Mills v. Esmark, Inc.*, 544 F.Supp. 1275, 1283 n.5 (N.D. Ill. 1982) ("The independence and good faith of [the SLC members] is also unimpaired by their earlier motions to dismiss plaintiffs' original complaint. Those motions, seeking dismissal on the ground that plaintiffs had failed to make adequate demand on the board under Rule 23.1, did not manifest any prejudgment of the merits of

As to the professional and personal relationships of two of the SLC members with Kehler and his family, we agree with the Court of Chancery that the SLC carried its burden to show the absence of a material issue of fact as to their independence. As noted previously, Lynton had professional and social connections with the Kehler family over many years, with less frequent contact recently. Floyd had a professional relationship with Kehler through the Board of Overseers of the University of Pennsylvania Nursing School. While the personal and professional relationship between Lynton and Kehler and his family were closer than what one would ordinarily expect of SLC members, several factors showed that, overall, the SLC members were capable of acting independently:

- The SLC members were individuals with significant backgrounds in business with prominent company positions and industry experience;

- The SLC members disclosed fully and upfront in the SLC process their personal and professional connections with Kehler and his family;[127]

- Neither SLC member was a defendant in the derivative litigation, having been brought on the EPL board after the events in question;

---

this case."); *Scalisi v. Grills*, 501 F. Supp. 2d 356, 362 (E.D.N.Y. 2007) (where the preliminary complaint was dismissed on the grounds that demand was not excused, the court held that "[s]imilarly unavailing in establishing lack of independence is plaintiffs' contention that the Committee members authorized or participated in efforts by defendants to dismiss the earlier October 2002 action.").

[127] *See Oracle*, 824 A.2d at 929 ("Noticeably absent from the SLC Report was any disclosure of several significant ties between Oracle or the Trading Defendants and Stanford University, the university that employs both members of the SLC.").

- No SLC member had exposure to liability or participated in the conduct in question;

- All SLC members were outside, non-management directors;

- No SLC member had a business relationship with EPL;

- The SLC was represented by independent counsel with no prior EPL relationship; and

- The SLC had a member whose independence is uncontested, and who joined in the SLC's report and agreed with the decision to move to dismiss the complaint.

We agree with the Court of Chancery that, based on the facts before it, the two SLC members were unlikely to sacrifice their personal and professional reputations for their relationship with Kehler and his family.

2.     Reasonableness of the SLC's Investigation and Conclusions

The Court of Chancery concluded that the SLC conducted a good faith investigation of reasonable scope that yielded reasonable bases supporting its conclusions.[128]  On appeal, Diep claims that the court "improperly resolved disputed questions of material fact" about "the negative impact of higher prices," "defendants' scienter," and "deterioration in 2015 Q2 Company SSS."[129]  Diep's

---

[128] *Diep*, 2021 WL 3236322, at *14 (quoting *London*, 2010 WL 877528, at *11) (articulating the *Zapata* standard of a good faith reasonable investigation).
[129] Opening Br. at ii.

arguments on appeal, however, misunderstand the nature of the court's review. When reviewing the good faith and reasonableness of the SLC's investigation:

> the granting of the SLC's motion using the Rule 56 standard does not mean that the court has made a determination that the claims the SLC wants dismissed would be subject to termination on a summary judgment motion, only that the court is satisfied that there is no material factual dispute that the SLC had a reasonable basis for its decision to seek termination.[130]

In other words, the question is not whether there were disputed issues of material fact about the three merits-based issues raised by Diep. Instead, the question is whether disputed issues of material fact were raised about the scope of the investigation and the reasonableness of the SLC's conclusions. We agree with the Court of Chancery that the SLC had reasonable bases to conclude that the TPP directors did not have material nonpublic information when TPP authorized the Block Trade.

First, the SLC found that the TPP directors had a reasonable basis to question Hawley's view that EPL's pricing actions caused a sales slowdown in Q2 2015. Without a causal link between the two, the SLC concluded that the TPP directors could not have material, nonpublic information about the connection between the pricing actions and the sales slowdown. While Diep focuses his arguments on how Hawley expressed concerns about pricing decisions and its impact on sales, the

---

[130] *Oracle*, 824 A.2d at 929 n.20.

quarters immediately following the pricing increases showed sales growth.[131] It was not until April and May 2015 that sales began to slump.[132] The record supports the SLC's view that it was not a situation where the board implemented a pricing change and saw an immediate impact. Rather, it was a long-term, larger-scale change that, in retrospect, influenced EPL's performance.[133]

To support its conclusion, the SLC relied on the board's contemporaneous reaction to Hawley's reports. The board members believed factors other than price increases better explained the price dip.[134] Hawley was just one point of view, and while he oversaw pricing reports, he was focused on short term results. Hawley also did not hold a consistent view and acknowledged to the SLC that the sales issues could be attributed to other factors, such as business trends.[135] EPL had variable sales patterns influenced by "the introduction of new products, refocusing of market emphasis, [and] operational issues[.]"[136] Roberts' presentation the day before Hawley's also supports the SLC's conclusion.[137] The SLC reviewed many documents and sources, and fully considered material unhelpful to EPL such as the draft Q&A answers. It determined that the board and the TPP directors could have

---

[131] App. to Answering Br. at B129, 136, 140–41.
[132] *Id.* at B141.
[133] *Id.* at B252–54 (discussing the Q2 2015 results and the influence of pricing in greater detail).
[134] *Id.* at B283–84.
[135] App. to Opening Br. at A1751.
[136] App. to Answering Br. at B294.
[137] *Id.* at B146–51.

reasonably believed that slowing sales were not attributable to the pricing actions. The SLC's conclusion was supported by the record and reasonable.

Second, the SLC had reasonable bases to support its conclusion that the financial information that formed the basis for Diep's insider trading claims was immaterial or made public. "For information to be material, there must be a 'substantial likelihood' that the nonpublic fact 'would have assumed actual significance in the deliberations' of a person deciding whether to buy, sell, vote, or tender stock." [138] When dealing with intra-quarter results and forecasts, the information is material "only when [it is] . . . likely that the company will either outperform or underperform its projections in some markedly unexpected manner[.]"[139]

Here, the SLC determined that the Q2 SSS sales information was not material because there was significant intra-quarter variability in EPL's results,[140] and it was public because EPL representatives disclosed the possibility of lower-than-expected results on the Earnings Call.[141] The SLC considered the information known to the EPL board and the TPP directors and found that "the internal performance data and dynamic forecasting of EPL's future performance, while indicating that EPL was

---

[138] *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd sub nom. In re Oracle Corp. Derivative Litig.*, 872 A.2d 960 (Del. 2005) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[139] *Id.* at 940; *see also* App. to Answering Br. at B298 (citing same).

[140] App. to Answering Br. at B421–25, B428–29.

[141] *Id.* at B304–05, B309.

performing below Plan for Company SSS, did not establish a likelihood that its sales performance would deviate in a markedly unexpected or extreme manner from the Company's prior projections . . . ."[142] And even if it was material, the SLC observed that the information was disclosed publicly, when the observation was made that it was likely the quarter results would be on the "low end of the range."[143]

Finally, as to whether TPP was motived to sell EPL stock by material nonpublic information, the SLC found that there was insufficient evidence to support the allegation. TPP's desire to sell EPL stock had been expressed prior to Hawley's presentation;[144] the sale took place on the first day of the first available sale window;[145] and TPP's actions were consistent with the behavior of private equity firms following an initial public offering.[146]

The SLC did consider facts pointing in the other direction. TPP failed to comply with EPL's Insider Trading Policy before conducting the Block Trade. While the failure was evidence of the need for more respect for corporate formalities, the SLC concluded that this fact was mitigated by EPL's knowledge of the Block Trade.[147] The SLC also considered an email that Sather sent Maselli with the early results of the customer survey value scores. In the email, Sather asked that the results

[142] *Id.* at B299.
[143] *Id.* at B305.
[144] *Id.* at B219–22.
[145] *Id.* at B347.
[146] *Id.* at B215–16 & n.1415.
[147] *Id.* at B295.

be kept "between us at this point as I don't want anyone to over react."[148]  The SLC

accepted Maselli's explanation that he understood Sather to be saying the report was

an "early read" and more data was needed before circulating the report more

broadly.[149]  The email was also sent after Maselli first looked into a sale and did not

mean that Maselli was motivated to trade on inside information.[150]

We agree with the Court of Chancery that no disputed issues of material fact

existed about the reasonableness of the SLC's investigation and its conclusions.

B.

The Court of Chancery decided to apply *Zapata*'s second step and saw no

reason to upset the SLC process or its comprehensive report.  In a one paragraph

argument on appeal, Diep claims that "the Court of Chancery abused its discretion

by ruling, under the second step of *Zapata*, that the SLC's conclusions were

'reasonable.'"[151]  According to Diep, the discretionary second step addresses

"instances where corporate actions meet the criteria of step one, but the result does

not appear to satisfy its spirit."[152]  He argues that, "[g]iven the extensive factual

record supporting [insider trading claims] against a controlling stockholder," the

---

[148] *Id.* at B143.
[149] *Id.*
[150] *Id.* at B219–20 (describing interest in a sale at least by May 1, 2015); *id.* at B347–48 (same).
[151] Opening Br. at 44.
[152] *Id.* (quoting *Zapata*, 430 A.3d at 789).

Court of Chancery should have found that dismissal "violates the spirit of *Zapata*."[153]

The second step of the *Zapata* analysis is "wholly within the discretion of the court[.]"[154] If it chooses to do so, the court determines, in its own business judgment, whether the suit should be dismissed. The discretionary second step preserves the court's role as the ultimate decider of whether litigation should be dismissed.[155] It serves as "the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee."[156] The court should exercise its discretion under *Zapata*'s second step and refuse to dismiss a derivative suit when "corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest."[157] As part of its review, the court should give "special consideration to matters of law and public policy in addition to the corporation's best interests."[158]

---

[153] *Id.*
[154] *Kaplan*, 499 A.2d at 1192.
[155] *Zapata*, 430 A.3d at 789; *see also id.* at 789 n.18 ("This step shares some of the same spirit and philosophy of the statement by the Vice Chancellor: 'Under our system of law, courts and not litigants should decide the merits of litigation.'").
[156] *Id.* at 789.
[157] *Id.*
[158] *Id.*

The Court of Chancery did not abuse its discretion when it applied *Zapata*'s second step. The record surrounding the SLC's report and its conclusions did not reveal any unusual concerns about the merits of the claims, the committee's process, or matters of law and public policy such that the court should have intervened and refused to dismiss the derivative suit as a matter of its own business judgment.

III.

We affirm the Court of Chancery's judgment.

**VALIHURA, J.,** dissenting:

As this Court recognized in *Zapata Corp. v. Maldonado*,[1] the SLC process affords a Delaware corporation the unique opportunity to dismiss claims against directors and officers, even after those claims have survived a pleading stage dismissal motion, and even after "years of vigorous litigation."[2] One of the trade-offs is that the independence of the members of the SLC must be "above reproach."[3]

I respectfully dissent because I believe there is an issue of fact as to the SLC's independence. The problem with the SLC's independence concerns Floyd's and Lynton's authorization of a motion to dismiss which challenged the substance of the very claims they were later charged with investigating as members of the SLC. Although the mere filing of a motion to dismiss need not be an automatic disqualifying event, I do not believe that this SLC has met its burden of establishing its independence.[4]

---

[1] 430 A.2d 779 (Del. 1981).

[2] *Id.* at 787; *see also Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985) (observing that, "[t]he only instance in American Jurisprudence where a defendant can free itself from a suit by merely appointing a committee to review the allegations of the complaint is in the context of a stockholder derivative suit[,]" and that "[a] defendant who desires to avail itself of this unique power to self destruct a suit brought against it ought to make certain that the Special Litigation Committee is truly independent").

[3] The phrase, "like Caesar's wife--above reproach," is more than just a famous aphorism. "Above reproach" means avoiding actions that suggest an appearance of a lack of objectivity or of behaving in a manner inconsistent with the duty to open-mindedly investigate the claims. *See* Merriam-Webster defines "above/beyond reproach" as "not calling for any criticism." *Above Reproach*, Merriam-Webster, https://www.merriam-webster.com/dictionary/above%20reproach (last visited June 21, 2022). Similarly, American Heritage defines "above/beyond reproach" as "[s]o good as to preclude any possibility of criticism." *Above Reproach*, The American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=above+reproach (last visited June 21, 2022).

[4] *See Zapata*, 430 A.2d at 789 (stating that the corporation has the burden of proving independence to the court under Court of Chancery Rule 56 standards).

The court applies a two-step test, articulated in *Zapata*, to determine whether the special litigation committee's motion to dismiss should be granted. The first step of *Zapata*'s two-step test emphasizes that a special litigation committee *must* be independent and above reproach.[5] The first step requires the court to "inquire into the independence and good faith of the committee and the bases supporting its conclusions."[6] "[T]he inquiry into the independence of SLC members is a narrow one[,]"[7] and the court conducts the inquiry without regard to whether the members acted in good faith, or conducted a reasonable investigation. Instead, the court investigates the members' personal interest in the disputed transactions, and "scrutinizes the members' relationship with the interested directors."[8] If the committee has ties to key officials suspected of malfeasance, is not fully empowered to act, or if the "committee behaves in a manner inconsistent with the duty to carefully and *open-mindedly* investigate the alleged wrongdoing, its ability to instill

---

[5] *See Lewis*, 502 A.2d at 967 ("If a single member committee is to be used, the member should, like Caesar's wife, be above reproach."); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1146 (Del. Ch. 2006) ("[I]n those rare circumstances when a special committee is comprised of only one director, Delaware courts have required the sole member, 'like Caesar's wife, to be above reproach.'" (quoting *Lewis*, 502 A.2d at 967)). The "above reproach" standard for a single member committee has since been used to describe the responsibilities of special litigation committee members generally. *See id.* at 1146 n.101 ("[I]n the context of a special litigation committee, [above reproach] has been used repeatedly to describe the responsibilities of directors charged with managing committees[.]"); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004) ("Unlike the demand-excusal context, where the board is presumed to be independent, the SLC has the burden of establishing its own independence by a yardstick that must be 'like Caesar's wife'—'above reproach.'" (quoting *Lewis*, 502 A.2d at 967)).

[6] *Zapata*, 430 A.2d at 788.

[7] *Sutherland v. Sutherland*, 958 A.2d 235, 239 (Del. Ch. 2008).

[8] *Id.* (internal quotation marks omitted) (quoting *Katell v. Morgan Stanley Grp., Inc.*, 1995 WL 376952, at *8 (Del. Ch. June 15, 1995)).

confidence is, at best, compromised and, at worst, inutile."[9]  The burden is on the corporation to prove the special litigation committee's independence, and the special litigation committee is entitled to no presumption of independence.[10]

Two of the three SLC members in this case, Floyd and Lynton, were elected to the Board of Directors on April 1, 2016.  The Verified Stockholder Derivative Complaint was filed on September 20, 2016, against Stephen J. Sather, Laurance Roberts, Edward Valle, Kay Bogeajis, Douglas K. Ammerman, Samuel N. Borgese, and Trimaran Pollo Partners, L.L.C. ("TPP").  El Pollo Loco Holdings, Inc. (the "Company" or "EPL") was named as a nominal defendant.  Floyd and Lynton were not named as defendants.[11]  The two count Complaint alleged breaches of fiduciary duties for insider trading and misappropriation of information (the "*Brophy*" claim), and breaches of fiduciary duties for issuing materially misleading statements and omissions.[12]  The Complaint's allegations centered on the May 19, 2015 stock sales, as well as the disclosures (or lack thereof) leading up to those sales.

---

[9] *Biondi v. Scrushy*, 820 A.2d 1148, 1156 (Del. Ch. 2003) (emphasis added), *aff'd sub nom. In re HealthSouth Corp. S'holders Litig.*, 847 A.2d 1121 (Del. 2004).

[10] *Zapata*, 430 A.2d at 788; *Kaplan v. Wyatt*, 484 A.2d 501, 507 (Del. Ch. 1984) ("For purposes of the motion the [c]ommittee is entitled to no presumption of independence, good faith and reasonableness."), *aff'd*, 499 A.2d 1184 (Del. 1985).

[11] Plaintiffs defined Sather, Valle, Boreajis, Ammerman, Borgese, and Trimaran Pollo Partners as the "Insider Trading Defendants." A107 (Compl. ¶ 120).  The first count is asserted against them. As the Vice Chancellor observed in denying the defendants' motion to dismiss this claim, "[t]he core concept of *Brophy* is to obtain disgorgement of the proceeds generated when insiders sell by misusing confidential company information."  *Diep v. Sather*, C.A. No. 12760, at 93 (Del. Ch. Mar. 17, 2017) (TRANSCRIPT) [hereinafter 2017 VC Oral Ruling Tr.].

[12] A107, A109 (Compl. ¶¶ 119–34).  *See Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949). The Complaint defines Sather, Roberts, and Valle as the "Disclosure Defendants."  A109 (Compl. ¶ 129).  The second count is asserted against them.

3

According to the Complaint, the Defendants misled and misdirected investors on a conference call two business days prior to the stock sales by stating that the decline in same stores sales growth in 2015 1Q and 2Q was attributable to the timing of New Year's eve, poor marketing communication, higher priced offerings, and a tough comparison with a strong 2014 2Q forecast.[13]  Diep alleged that the problem was "more straightforward" in that "customers had reacted negatively and immediately because of the increases in price on the Company's value menu."[14]

On May 19, 2015, two business days after the May 14th conference call, "CEO Sather, CMO Valle, COO Bogeajis, the Company's controlling stockholder, Trimaran Pollo Partners, and other Company insiders collectively sold approximately *6 million shares* of El Pollo Loco stock for gross proceeds of *over \$132 million*[.]"[15]  The Complaint alleged that the stock sales were "suspicious in amount and timing, and were not made pursuant to any 10b5-1 trading plans."[16]  It alleged that in making these trades, the

---

[13] A110 (Compl. ¶¶ 69, 73, 95, 133). "It was not so much the 'extended tests of alternative proteins'—a reference to the promotions of shrimp and carne asada (beef)—or a tougher comparison with 2014, that caused the declining trend in the 2015 2Q.  Instead, as the presentation two days earlier by CMO Valle revealed, it was the effect of higher prices across the entire existing menu that had hit customer traffic, causing the Company to forecast a 1% fall in customer traffic at Company-operated restaurants in the 2015 2Q."  A91–92 (Compl. ¶ 71).

[14] A99 (Compl. ¶ 91).  Diep alleged that:  "[a]lthough the information regarding the Company's declining sales performance and the reasons for this performance were highly material, Defendants omitted to disclose [sic] this material information, even when directly asked about the subject.  Indeed, Defendants affirmatively misled stockholders."  A90 (Compl. ¶ 67).

[15] A95–96 (Compl. ¶ 81) (emphasis in original).  The Complaint further alleges that the prices of the stock ranged from "\$2.62 to 5.84 per share, a fraction of the market price."  A96 (Compl. ¶ 82).

[16] A96 (Compl. ¶ 83).

4

defendants violated the Company's Insider Trading Policy -- a fact not disputed.[17]  Further, the Complaint stated that "[a]t the time of the [] trades, the insiders were all aware of material, negative information that had not been fully disclosed to (indeed, deliberately withheld from) investors on the May 14, 2015 conference call."[18]

According to the Complaint, on August 10 and 11, 2015, EPL's Board held a two-day regular meeting.  On the second day of the meeting, the Director of Marketing Planning and Analysis, Ryan Hawley, stated that "sales had fallen across *all* demographics, across *all* modes of orders (dine in/take-out/drive-through), and *all* parts of the day (lunch, snack and dinner)."[19]  The Complaint alleged that "Hawley pointed to price increases in February 2015, the 'steady increase in LTO [limited time offering] prices through Q2,' and 'significant price increases on all of our top sell[ing products]' for a drop in the Company's value scores and the decline in transaction (traffic) growth in the 2015 1Q and 2Q."[20]

The Complaint further alleged that on August 13, 2015, nearly three months after the alleged insider sales, "El Pollo Loco was forced to reveal the truth when announcing its 2015 2Q results."[21]  Specifically,

> After the close of trading on August 13, 2015, the Company issued a press release announcing its results for the 2015 2Q (the three-month period ended July 1, 2015).  Contrary to the Company's prior claims of being on track to

---

[17] *See* A1636 (Special Litigation Committee's Opening Br. in Supp. of Mot. to Dismiss Count I Against TPP at 32) (acknowledging that "TPP did not comply with the [Insider Trading] Policy's written pre-clearance procedures").

[18] A97 (Compl. ¶ 86).

[19] A98 (Compl. ¶ 88) (emphasis in original).

[20] A98 (Compl. ¶ 89) (alterations in original).

[21] A99 (Compl. ¶ 91).

5

achieve 3%-5% comparable store sales increases, the Company reported that the 2015 2Q '[s]ystem-wide comparable restaurant sales [had only grown] *1.3% including a 0.5% decrease for company-operated restaurants*, and a 2.6% increase for franchised restaurants.' The 0.5% decrease at Company-operated restaurants was driven by a *3.9% decrease in traffic*, much worse than the internal forecast of a 1% decrease.[22]

The Company announced that "it was cutting its fiscal year 2015 guidance for comparable store sales growth from a range of 3% to 5% to just 3% because of the Company's significant miss in the 2015 2Q."[23] According to the Complaint, "[a]nalysts reacted with surprise to all of El Pollo Loco's revelations, reflecting the extent to which they had been misled by senior management[,]"[24] and ultimately, "El Pollo Loco's stock price fell by 20%, from its closing price of $18.36 per share on August 13, 2015 to $14.56 per share on August 14, 2015 – *33% below the price at which Company insiders had sold $132 million of their own stock*, and erasing more than *$410 million* in market capitalization."[25]

All defendants, including nominal defendant EPL, responded with a motion to dismiss (the "2016 Motion"),[26] and they filed a brief captioned, "Defendants' Brief in Support of Their Motion to (A) Stay This Action in Deference to the Prior Pending Federal Securities Action or (B) in the Alternative, Dismiss Pursuant to Rules 23.1 and 12(B)(6)"

---

[22] A99–100 (Compl. ¶ 93) (alterations and emphasis in original).

[23] A100 (Compl. ¶ 94).

[24] A102 (Compl. ¶ 99).

[25] A103 (Compl. ¶ 101) (emphasis in original).

[26] At the time of the 2016 Motion, the EPL Board consisted of nine members: Michael Maselli, Stephen Sather, Dean Kehler, John Roth, Douglas Ammerman, Samuel Borgese, Mark Buller, Bill Floyd, and Carol "Lili" Lynton. A131 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 11).

on December 17, 2016. The 2016 Motion sought dismissal of the Complaint on two grounds: (i) failure to plead demand futility under Court of Chancery Rule 23.1; and (ii) failure to state a claim under Court of Chancery Rule 12(b)(6).[27] Nominal defendant EPL joined the motion to dismiss on demand futility grounds under Rule 23.1 only, and expressly stated that it was not joining in the Rule 12(b)(6) ground.[28] Counsel from Skadden, Arps, Slate, Meagher & Flom LLP signed the 2016 Motion on behalf of nominal defendant EPL and on behalf of defendants Chief Operating Officer Kay Bogeajis, Chief Marketing Officer Edward J. Valle, Chief Financial Officer Laurance Roberts, and Chief Executive Officer Stephen J. Sather. Of these defendants, Bogeajis, Sather, and Valle were Insider Trading Defendants.[29]

Counsel from Richards, Layton & Finger, P.A. and Sullivan & Cromwell LLP signed the 2016 Motion on behalf of outside director defendants Douglas K. Ammerman and Samuel N. Borgese (both of whom were Insider Trading Defendants),[30] and Counsel from Ballard Spahr LLP signed on behalf of EPL's controlling stockholder defendant, TPP

---

[27] A113–75 (Defs.' Br. Supp. Mot. to Stay or Dismiss).

[28] A173 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 53) ("Nominal Defendant El Pollo Loco does not join in the motion to dismiss pursuant to Rule 12(b)(6).").

[29] A107 (Compl. ¶ 120).

[30] *Id.*

7

(an Insider Trading Defendant).[31]  Floyd and Lynton were on the Board when the 2016 Motion was filed but, as noted, were not named as defendants in the action.[32]

Defendants collectively argued that the Complaint failed to plead particularized facts demonstrating that a majority of the board faced a substantial likelihood of liability. Defendants also argued that the "alleged non-public information was disclosed," the "undisclosed intra-quarter results were immaterial," and that there were "no particularized facts demonstrating scienter."[33]

The 2016 Motion did not merely raise technical or procedural arguments as to why the derivative claims should be dismissed.  Instead, the 2016 Motion affirmatively argued the very substantive issues that the SLC would later be tasked with independently investigating.  For example, the 2016 Motion asserted the following:

---

[31] *Id.*

[32] Although separate representation is not mandated in all situations, and although courts have divided on the issue, "there is substantial support for the idea that the corporation and the shareholders should retain separate counsel in [a] derivative lawsuit where the underlying claim sounds in fraud (as opposed to negligence) and where the corporation takes '*an active role*' in the litigation." *Scott v. New Drug Servs., Inc.*, 1990 WL 135932, at *4 (Del. Ch. Sept. 6, 1990) (emphasis added), *reprinted in* 16 Del. J. Corp. L. 1561, 1567 (1991).  *See* 3 Robert S. Saunders, Jennifer C. Voss & Cliff C. Gardner, *Folk on the Delaware General Corporation Law* §327.07 (7th ed. 2021-3 Supp.) ("Whether circumstances require separate representation of corporate and individual defendants in a derivative action is a 'highly fact specific' question.  The Court of Chancery has [also] noted that [although], in theory, separate representation may be the better practice, it may be 'unreasonable and wastefully expensive to require separate counsel to represent the corporate and individual defendants [when] the corporation will remain a neutral party whose counsel is generally unable to alter the outcome of the litigation' and, therefore, separate representation is not mandated in all situations." (third alteration in original) (footnotes omitted)). The bottom line is that although representation decisions require careful attention to a myriad of facts and circumstances that make setting bright-line rules difficult, courts have recognized the difficulties that are created by dual representation in a shareholder derivative suit alleging fraud, intentional misconduct, or self-dealing on the part of the directors and officers.

[33] A161, A165, A168 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 41, 45, 48).

- "[N]either the timing nor the amounts of stock sold were suspicious. Three directors and a large stockholder sold only a fraction of their El Pollo Loco holdings. They did so at their first opportunity to sell after the expiration of lockup agreements and other trading restrictions."[34]

- "[N]one of Plaintiffs insider trading allegations are sufficient as to any of the directors."[35]

- "The undisclosed intra-quarter results were immaterial."[36]

- "[T]he first time a permitted selling window opened for corporate insiders was on May 19, 2015, the day the Sellers made their disputed sales." "It is hardly suspicious that corporate insiders would take advantage of the first liquidity opportunity after an IPO. Indeed, courts uniformly find that such timing *negates* an inference of scienter."[37]

- "[T]he Sellers sold at a time that did not maximize their potential return, further negating an inference that they calculated the sales to reap the benefits of insider information."[38]

- "[T]he fact that the Sellers retained a significant percentage of their holdings also negates scienter. Insiders' sales fail to create an inference of scienter when the sales constitute a portion of their total holdings in the company."[39]

- "[T]he lapse in time between the May 19 sales and the alleged bad news disclosed months later on August 13 further underscores the lack of scienter."[40]

- "The alleged non-public information was disclosed."[41]

---

[34] A127 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 7).

[35] A159 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 39).

[36] A165 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 45).

[37] A168–69 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 48–49) (emphasis in original).

[38] A170 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 50).

[39] A171 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 51).

[40] *Id.*

[41] A161 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 41).

9

- "The market's awareness of El Pollo Loco's menu changes and the impact on same store traffic is confirmed by contemporaneous analyst reports."[42]

The Company, as nominal defendant, joined in each of these arguments,[43] which were directed to the very heart of the *merits* of the derivative suit. Counsel for EPL presented oral argument on behalf of all Defendants on March 17, 2017.[44] Thus, the Company did not take a neutral position.[45] Although a company is not required to take a neutral position, taking an active, or as here, a leading role challenging the substance of the claims, may

---

[42] A163 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 43).

[43] The 12(b)(6) portion of the 2016 Motion consisted of one full paragraph discussing the Rule 12(b)(6) standard, and the sentence: "Here, for the same reasons discussed above, Plaintiff has failed to plead sufficient facts to state an insider trading claim under *Brophy*." A173 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 53). During the argument on the 2016 Motion, Counsel for EPL, who also represented certain of the Insider Trading Defendants, commented that the directors had also moved to dismiss under Rule 12(b)(6) but "the interaction of the arguments under 12(b)(6) and 23.1 is -- or the overlap of the arguments is virtually complete because of the standard that applies here." 2017 VC Oral Ruling Tr., C.A. No. 12760, at 24. Counsel's argument centered on the "heart of the case" which was whether plaintiffs had alleged a *Brophy* claim with respect to the members of the board who were alleged to have sold directly or indirectly on May 19. *Id.* at 25–26.

[44] 2017 VC Oral Ruling Tr., C.A. No. 12760, at 4.

[45] *See Scott*, 1990 WL 135932, at *4 ("While, in theory, separate representation may be the better practice (and might be expected to enhance the credibility of any position taken by the corporation), I am mindful that it may be 'unreasonable and wastefully expensive to require separate counsel to represent the corporate and individual defendants . . . [when] the corporation will remain a neutral party whose counsel is generally unable to alter the outcome of the litigation.'" (alteration in original) (quoting *Independent Representation for Corporate Defendants in Derivative Suits*, 74 Yale L.J. 524, 530 (1965))). Chancellor Allen commented further in *Scott* that, "[w]hat circumstances will require separate representation is obviously a question that is highly fact-specific[,]" and that "[c]ounsel (and a court required to pass upon a disqualification motion) must attempt to assess the likelihood that the corporation will be required, or it will be in its interest, to take an active part in the litigation." *Id.*

10

come with some risks as the litigation develops.[46] One such risk is that a court may not be convinced that the SLC members' independence is "above reproach" when the company has argued previously in court that the claims were meritless.

In the 2016 Reply Brief, the Company doubled down arguing:

- "Plaintiff failed to allege that any of the nine directors faces a substantial likelihood of liability on the *Brophy* claim."[47]

- "Plaintiff has failed to plead that any member of the Board possessed material, non-public information, or acted with scienter."[48]

- "[T]he supposed non-public information was, in fact, disclosed."[49]

- "[T]he information about second quarter 2015 sales projections was not material because it was provided only three weeks into the second

---

[46] Retaining the same counsel for the corporation and the defendant directors comes with potential risks, especially if the complaint survives a motion to dismiss. *See* 1 R. Franklin Balotti, Jesse A. Finkelstein, John Mark Zeberkiewicz & Blake Rohrbacher *Delaware Law of Corporations and Business Organizations* § 13.10 (4th ed. 2022-1 Supp.), Westlaw (database updated 2022) ("[I]t is the customary practice for the corporation and the defendant directors to have separate counsel in a derivative action, especially if the complaint has survived a motion to dismiss."). *See, e.g.*, *Essential Enters. Corp. v. Dorsey Corp.*, 182 A.2d 647, 654 (Del. Ch. 1962) ("[T]he same attorneys represented both the corporation and the individual defendants. I need not pass upon the desirability or propriety of this practice. The present practice in this court is for the corporation to have a different attorney. This might seem artifical [sic], but, in theory, the 'interests' involved may be quite different and the corporate attorney should so understand his obligation."). *See also* Robert L. Haug, Ed., Business and Commercial Litigation in Federal Courts, § 26.18 (Responding to a Derivative Claim) (Dec. 2021 Update) ("While courts have allowed all defendants to be represented by the same counsel, courts generally have 'no hesitation in holding that—except for potentially frivolous cases—allegations of directors' fraud, intentional misconduct, or self-dealing requires separate counsel.'" (citing *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993))). In *Bell*, joint representation was permitted as there were allegations of breaches of the duty of care with little support and a special litigation committee had decided that the "corporation's interests were more in line with those of the defendants than plaintiffs." *Bell*, 2 F.3d at 1316.

[47] Defs.' Reply Br. in Further Supp. of Mot. to Stay or Dismiss, C.A. No. 12760-VCL, Dkt. No. 18, at 19 (Del. Ch. Feb. 6, 2017).

[48] *Id.* at 20.

[49] *Id.*

11

quarter, the Board was informed that various initiatives were being taken to boost sales, and the projected sales were consistent with what was disclosed to stockholders."[50]

- "Plaintiff has not pleaded particularized facts demonstrating scienter because the challenged stock sales were the first time that insiders were permitted to sell shares as a result of IPO lockups and trading windows, the sellers sold only a portion of their holdings, and they sold after El Pollo Loco's stock price dropped almost 20%."[51]

On March 17, 2017, the Court of Chancery issued an oral ruling denying the 2016 Motion on both Rule 23.1 and 12(b)(6) grounds.[52] The court found that Diep had successfully pleaded a *Brophy* claim sufficient to withstand dismissal because the Complaint "specifically highlight[ed] what [wa]s in the board book and why it support[ed] an inference that the statements made at the conference call were incorrect and that the defendants had material information to the contrary."[53]

Regarding the argument that there was no inference of scienter, the court stated that "knowledge can be alleged generally under Rule 8[,]" and that "[t]here is plenty of circumstantial evidence to support this."[54] The court then highlighted some of the factual

---

[50] *Id.* at 26.

[51] *Id.* at 29.

[52] 2017 VC Oral Ruling Tr., C.A. No. 12760, at 88. The court also stayed Count II in favor of the California federal securities actions, and denied the stay as to Count I, which asserted a *Brophy* claim under Delaware law.

[53] *Id.* at 103 (citing Compl. ¶¶ 53–66). The Court of Chancery rejected some of the defendants' other arguments, such as the results were just preliminary, or that this was a "pure projections case." *Id.* at 105–07. The court also provided its explanation for the different outcome in this case compared to the federal action, noting that the federal case "was evaluated under a higher standard under the Private Securities Litigation Reform Act, which require[d] that the allegations support a strong inference of scienter," and also that it was "evaluated in a context where the plaintiffs in that case, having not used Section 220, could only cite to the public transcript . . . ." *Id.* at 90.

[54] *Id.* at 107.

12

allegations pled in the Complaint. For example, the court noted that the fact that the directors "might have sold more doesn't negate an inference of scienter."[55] The court also found that the fact that the directors sold in a declining market did not negate scienter. Further, the court noted that "CEOs usually don't sell because it sends a negative signal to the market when they abandon the company."[56] The court emphasized that "[t]he fact that a defendant could have used insider information more effectively does not defeat an otherwise valid inference of insider trading."[57] Therefore, the court found that "at this stage of the case there's a reasonable inference of scienter[,]"[58] and denied the motion to dismiss on both 12(b)(6) and 23.1 grounds.

Having denied the Rule 12(b)(6) motion, the court stated that the "Rule 23.1 motion becomes easy."[59] To exercise disinterested and independent judgment, "there needs to be a board majority that is disinterested and independent."[60] It found that at least five of the nine directors who were on the board when the Complaint was filed were not. Sather, Ammerman, and Borgese were sellers and faced a substantial risk of liability for breach of the duty of loyalty, and the three other directors affiliated with TPP were "insiders of the controller when the controller unloaded shares."[61] Thus, demand was found to be futile.

---

[55] *Id.* at 108.

[56] *Id.*

[57] *Id.*

[58] *Id.* at 109.

[59] *Id.*

[60] *Id*.

[61] *Id*. at 110.

Following the court's oral ruling on March 17, 2017, the parties began to engage in discovery. Thereafter, on October 6, 2017, EPL's board of directors appointed Floyd and Lynton to the SLC to investigate and evaluate the allegations and issues raised in the Complaint. In January of 2018, the Board added a third member.[62] Also in January of 2018, the parties stipulated and agreed to stay all proceedings in the action, including all discovery, until the SLC concluded its investigation.[63]

On February 13, 2019, the SLC filed its initial Motion to Dismiss based on the Report of the SLC (the "Report").[64] The parties then engaged in further discovery based on the Report.

Diep's counsel, Hung G. Ta, took Floyd's deposition on January 17, 2020.[65] During his deposition, Floyd testified that he discussed the litigation with Kehler "briefly" before joining the Board.[66] He recalled that Kehler said that "we did nothing illegal, we did nothing unethical, but he said the optics did not look good with the, you know, with the

---

[62] Diep does not challenge the independence of Babb, the third member of the SLC, who was appointed four months after the SLC was created. One could infer that adding a third member to the SLC four months after creating the SLC suggests that the Board perceived an issue with the SLC's independence.

[63] Stipulation and Proposed Order Staying Proceedings Pending Special Litigation Committee Investigation, C.A. No. 12760-VCL, Dkt. No. 56 (Del. Ch. Jan. 16, 2018).

[64] Stipulation and Proposed Order Staying Proceedings Pending Special Litigation Committee Investigation, C.A. No. 12760-VCM, Dkt. No. 161 (Del. Ch. Mar. 30, 2020).

[65] *See* B488 (Excerpts of Floyd's Dep. at 238). This Court was provided extremely limited excerpts of Floyd's deposition.

[66] B469 (Excerpts of Floyd's Dep. at 10).

14

trading of the stock."[67]  Floyd was also asked whether he recalled the board discussing the

2016 Motion.  The following exchange took place:

> Q.  But is your understanding that back in 2016, as one of the steps to stop this litigation from proceeding, that El Pollo Loco Holdings applied to the Delaware Chancery Court to have this case dismissed?  Do you recall - -
>
> A.  Yes.
>
> Q.  Do you understand that?
>
> A.  Yes.
>
> Q.  Okay.  And do you recall the process by which the board -- well, first of all, did the board discuss this step of getting the Delaware Chancery Court to dismiss this litigation back in 2016?
>
> A.  Yes, they did, but I don't recall any of the details of it.
>
> Q.  Do you recall if there were discussions on the board about the subject?
>
> A.  At that period of time, as part of the board agenda, we would have a litigation update of which I'm sure this was part and – I'm sure there is -- there was discussion about it, but I don't recall the details.
>
> Q.  And when you were on the board at that time -- withdraw that.  Do you recall any one on the board objecting to applying to the Delaware Chancery Court to have the case dismissed back in 2016?
>
> A.  I don't recall anybody objecting.
>
> Q.  Did you object to applying to the Delaware Chancery Court back in 2016 to have this case dismissed?
>
> A.  I did not.[68]
>
> . . . .
>
> Q.  You approved the filing of this application to the Delaware Chancery Court?
>
> A.  As a member of the board, I don't recall whether it was put to a formal vote, how it was handled, but I don't -- I don't remember any details that -- of getting into depth about this at the board meeting.[69]

---

[67] B469–70 (Excerpts of Floyd's Dep. at 10–11).

[68] B481–82 (Excerpts of Floyd's Dep. at 65–66).

[69] B482–83 (Excerpts of Floyd's Dep. at 66–67).

15

Based upon the limited excerpts of Lynton's deposition provided to this Court, it appears that Lynton was not questioned about her recollection of the board meetings, whether the litigation was discussed, or whether she objected to the filing of the motion to dismiss.[70]

The SLC filed its Opening Brief in Support of its Motion to Dismiss Count I against TPP on September 25, 2020.[71]  After briefing concluded, the Court of Chancery scheduled oral argument on the SLC's motion to dismiss on April 23, 2021.[72]  The day before oral argument, on April 22, 2021, Diep and defendants Bogeajis, Roberts, Sather, Valle, Ammerman, and Borgese (the "Settling Defendants") filed their Stipulation and Agreement of Compromise and Settlement.[73]  The Settling Defendants agreed to collectively pay $625,000 in exchange for Diep's agreement to release them from the claims asserted in this action.[74]  At that point, TPP was the only remaining defendant.

Diep relies upon this limited record to argue that there is a material issue of fact about whether Floyd and Lynton prejudged the merits of the suit.  He centers his argument

---

[70] *See generally* B444–66 (Excerpts of Lynton's Dep.).

[71] Special Litigation Committee's Opening Br. in Supp. of Mot. to Dismiss Count I Against TPP, C.A. No. 12760-KSJM, Dkt. No. 163 (Del. Ch. Sept. 25, 2020).

[72] Letter to Counsel Confirming Oral Argument Date and Time, C.A. No. 12760-KSJM, Dkt. No. 173 (Del. Ch. Jan. 25, 2021).

[73] Stipulation and Agreement of Compromise and Settlement, C.A. No. 12760-KSJM, Dkt. No. 176 (Del. Ch. Apr. 22, 2021).

[74] *Id.*  The settlement figures associated with this suit ($625,000) and the federal "*Turocy* Class Action" and settlement ($20 million), taken together, suggest that the allegations were not merely conclusory.  *See* A1696–97 (Pl.'s Br. in Opp. to Special Litigation Committee's Mot. to Dismiss at 18–19) ("In January 2019, the parties to the *Turocy* Class Action reached an agreement to settle the action in principle for a cash payment of $20 million.").

16

on their participation in the 2016 Motion. The record reflects that Floyd and Lynton were on the Board at the time the 2016 Motion was filed. It also suggests, through Floyd's testimony, that the Board discussed the 2016 Motion as part of a ligation update,[75] and that no director objected to the filing.

The Court of Chancery viewed Diep's contentions as essentially challenging whether merely being a board member when the motion was filed resulted in the SLC members being conflicted. But the record shows more than just their mere presence on the Board when the 2016 Motion was filed. It shows that the 2016 Motion was discussed with the Board and that no director objected to its filing. Floyd specifically stated that he did not object to the filing. The logical conclusion is that the Board, at least tacitly, approved and authorized filing the 2016 Motion after that discussion. An important aspect of a board's managerial decision-making is whether to initiate, or refrain from initiating, litigation on the corporation's behalf.[76] When faced with serious insider trading claims against certain directors and officers of the company, and with the decision of whether or

---

[75] The parties sent letters to our Court after oral argument before this Court regarding an alleged misstatement by Diep's counsel. Specifically, Diep's counsel's letter stated that during oral argument, Mr. Ta stated "We [Appellants] don't have anything more than that Your Honor because as we said, this discovery was one-sided. We weren't given the Board minutes for the meetings in 2016 when this litigation update was provided." Diep's Letter, Apr. 4 (alteration in original) (citing Oral Argument video at 19, https://livestream.com/accounts/5969852/events/10198585/videos/230258828/player). The letter clarified that "although not included in the limited discovery of the SLC, the minutes for the two-day Board meeting that occurred on October 31 and November 1, 2016 were subsequently appended as Exhibit D to the Reply Brief in Further Support of its Motion to Dismiss, that the SLC filed in the Court of Chancery on January 21, 2021[.]" *Id.*

[76] *See Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

17

not to initiate suit against them, or move to dismiss the suit, it follows that the Board would consider this an important decision. The 2016 Motion was obviously authorized by someone. Given that a corporation acts through its board of directors,[77] and given that the motion was the subject of a Board discussion, the record suggests that the Board authorized it.

Appellees have pointed us to the minutes from the October 21, November 1, 2016 Board meeting -- minutes which the SLC chose not to produce in discovery. Rather, the SLC apparently submitted the minutes with their reply brief to the 2016 Motion. Nor did the SLC include the minutes in our record -- Diep submitted them after oral argument before our Court.[78] These belated productions suggest to me that neither side thought they added much to the mix of information. To be clear, the relevant portion of those minutes states:

## IV. BOARD DISCUSIONS

**The Board received the following updates:**

---

[77] *See, e.g.*, *In re Aerojet Rocketdyne Holdings, Inc.*, 2022 WL 2180240, at \*10 (Del. Ch. June 16, 2022) ("'A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law.' 'Because it lacks a body and mind, a corporation only can act through human agents.' Under Delaware law, a company's directors are the corporate agents charged with managing the business and affairs of the corporation." (quoting *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 636 (1819); *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 60 (Del. Ch. 2015)) (citing 8 *Del. C.* § 141(a))); *Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291 (Del. 1998) ("One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation." (citing 8 *Del. C.* § 141(a))).

[78] In contrast to the weight given to these minutes by the Majority, Diep's counsel's transmittal letter to this Court states that "neither party included these minutes in the Record for this appeal." Diep's Letter, Apr. 4.

18

. . . .

**(c) Edith R. Austin, Vice President, Legal concerning pending litigation.**

**The meeting was adjourned at 5:45 p.m. Pacific Daylight Time on October 31, 2016.**

Appellees have argued that "[t]he minutes contain no indication that any member of the Board was asked to approve the filing of the 2016 [Motion.]"[79] But if any conclusion from these minutes is to be drawn, it should be that these minutes, along with Floyd's testimony, suggest that the Board discussed the 2016 Motion and approved of its filing.

Moreover, it does not matter whether Floyd or Lynton read the 2016 Motion.[80] Given that it is completely reasonable to conclude that they authorized the filing, they

---

[79] SLC Letter in Resp. to Diep's Letter, Apr. 5, 2022.

[80] The SLC's counsel was asked during oral argument before this Court whether determining if Floyd or Lynton read the briefs was even relevant.

> The Court: Is this even the question that's relevant, I would ask, and that is, a lawyer has taken a position on behalf of a client that may be seen as having prejudged claims that the client has had to review later on? I'm not sure whether she read the brief is even relevant.

> Mr. Offenhartz: Well, Your Honor, I think it is because, well, I think the issue we're grappling with is, did the brief, and we respectfully think that if they didn't read it, it would not cause them to prejudge anything, but what we're really looking at is, were Ms. Lynton or Mr. Floyd prejudging their investigation before they started? Did the existence of the motion to dismiss cause them to prejudge anything? I mean, I think that's ultimately the test. I don't think, and in fact the Delaware cases are clear, they don't want a box, if you do "X" you're out, it's got to look at the totality of circumstances.

> The Court: Doesn't a motion have to be authorized by a client?

> Mr. Offenhartz: Well, Your Honor, yes, but a motion to dismiss, even if authorized by the client, it doesn't mean that these two individuals reviewed it, absorbed it, necessarily got into the minutia of it, and adopted it and made it their own. . . .

Oral Argument video at 35:17, https://livestream.com/delawaresupremecourt/events/10198585/videos/230258828.

19

should have known what they were authorizing. The SLC bears the burden of establishing its independence which, in this case, includes establishing that they did not prejudge the merits of serious insider trading claims they previously challenged in a direct and substantive way when the Company battled with Diep for six months over the dismissal motion. The SLC cannot satisfy that burden simply by claiming ignorance about the Company's and the Board's prior involvement in litigating those claims. Giving the SLC a pass on what I believe is a credible factual challenge to their independence because they claim ignorance of the arguments made on the Company's behalf would not create the right incentives.

Determining whether an SLC is independent is a fact-intensive inquiry. In *London v. Tyrrell*,[81] the Court of Chancery stated that "[w]hen SLC members are simply exposed to or become familiar with a derivative suit before the SLC is formed this may not be enough to create a material question of fact as to the SLC's independence."[82] But a question of fact as to the SLC's independence may be raised "if evidence suggests that the SLC members *prejudged the merits* of the suit based on that prior exposure or familiarity, and then conducted the investigation with the object of putting together a report that demonstrates the suit has no merit."[83] Similarly, if the potential conflicts of interest or divided loyalties, when considered as a whole, raise a question of fact as to an SLC

---

[81] *London v. Tyrrell*, 2010 WL 877528 (Del. Ch. Mar. 11, 2010).

[82] *Id.* at *15.

[83] *Id.* (emphasis added).

member's independence, then the moving party has not borne its burden of showing the absence of *any* possible issue of fact material to the independence of the SLC.[84]

Here, Floyd's testimony confirms that the directors discussed the 2016 Motion, that he did not recall anyone objecting, and that he did not object to the filing. Further, the 2016 Motion challenged the core arguments set forth in the complaint. EPL, as a nominal defendant, affirmatively joined the 2016 Motion pursuant to Rule 23.1 and, in fact, took the lead in challenging the "heart" of Diep's core allegations. EPL was hardly acting in a neutral capacity. In my view, the SLC failed to show there was an absence of a material issue of fact as to the independence of Floyd and Lynton.

Furthermore, a side-by-side comparison of the assertions in the 2016 Motion and the SLC's motion to dismiss illustrates the similarities between the 2016 Motion and the SLC Motion:

| 2016 Motion to Dismiss | SLC Motion to Dismiss |
|---|---|
| "Neither the timing nor amounts of stock sold were suspicious. Three directors and a large stockholder sold only a fraction of their [EPL] holdings. They did so *at their first opportunity to sell after the expiration of lockup* | "[T]he timing of the Block Trade . . . does not suggest an ulterior motive, but instead supports the notion that TPP was liquidating a long-standing investment *at each available opportunity*."[86] |

---

[84] *Lewis*, 502 A.2d at 967 (After listing the circumstances which lead the Court of Chancery to question a committee member's independence, the court stated that "[t]hese potential conflicts of interest or divided loyalties, when considered as a whole, raise a question of fact as to whether Terry Sanford could act independently. This is not to say that he actually acted improperly, but [the court] find[s] that the moving party has not borne its burden of showing the absence of any possible issue of fact material to the issue of the independence of Mr. Sanford." (citing *Warsaw v. Calhoun*, 213 A.2d 539, 541–42 (Del. Ch. 1965)*, aff'd,* 221 A.2d 487 (Del. 1966))).

[86] A1663 (SLC's Opening Br. Supp. Mot. to Dismiss at 59) (emphasis added).

| | |
|---|---|
| *agreements* and other trading restrictions."[85] | |
| "It is hardly suspicious that corporate insiders would take advantage of the first liquidity opportunity after an IPO."[87] | "[T]he timing of the Block Trade—during the first open trading window following the November 19, 2014 secondary offering . . . supports the notion that TPP was liquidating a long-standing investment at each available opportunity."[88] |
| "The alleged non-public information was disclosed."[89] | "[I]n advance of the Block Trade, the Company accurately disclosed that Q2 2015 [same-store sales] would likely be below market expectations."[90]<br><br>"The SLC determined that (i) TPP did not possess material, nonpublic information, and (ii) TPP was not motivated, in whole or in part, to sell EPL shares by the allegedly material, nonpublic information at issue."[91] |

---

[85] A127 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 7) (emphasis added).

[87] A169 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 49).

[88] A1663 (SLC's Opening Br. Supp. Mot. to Dismiss at 59). The "secondary offering" refers to the second opportunity that TPP had to sell its shares.

[89] A161 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 41).

[90] A1664 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 60). Stated another way, "in recognition of the Company's early Q2 2015 performance in comparison to market expectations, the TPP Directors supported the decision to disclose the softness in sales despite the Company's prior practice of only providing full-year guidance, which likewise cuts against a claim that TPP was seeking to trade on undisclosed information." *Id.*

[91] A1637 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 33).

22

| | |
|---|---|
| "The undisclosed intra-quarter results were immaterial."[92] | "The intra-quarter performance and forecasting data available to the TPP Directors at the time of the Block Trade was not material under Delaware law."[93] |

The SLC cites four cases,[94] namely, *Kaplan v. Wyatt*,[95] *Katell v. Morgan Stanley Group, Inc.*,[96] and *Kindt v. Lund*,[97] as well as the United States District Court for the Southern District of New York case, *Strougo ex rel. The Brazil Fund, Inc. v. Padegs*.[98] Only three address the independence of the committee members and only one does so in the context of the members' participation in a prior motion to dismiss.[99]

---

[92] A165 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 45).

[93] A1657 (Defs.' Br. Supp. Mot. to Stay or Dismiss at 53).

[94] The Majority cites two other cases, namely, *Scalisi v. Grills*, 501 F. Supp. 2d 356 (E.D.N.Y. 2007) and *Mills v. Esmark, Inc.*, 544 F. Supp. 1275 (N.D. Ill. 1982). These decisions do not analyze the prior motion to dismiss in any substantive way. In addition, *Scalisi* applies Maryland law, and appears to apply a different standard. In *Scalisi*, the parties disagreed as to what the appropriate standard was under Maryland law. Without making a determination as to which standard was correct, it appears that the court applied a combination of the two suggestions. First, the court applied a standard set forth by the New York Court of Appeals that limited the courts review to "an analysis of the adequacy or appropriateness of the investigation and to an inquiry into the independence of the committee members." *Scalisi*, 501 F. Supp. 2d at 361. Second, the court took an "additional step set forth in *Zapata*" and also considered whether the court was satisfied with the SLC's conclusions. *Id.* at 362. The *Scalisi* court did not expressly apply *Zapata*'s first prong, which includes the heightened independence standard discussed herein. Thus, the limited inquiry into the independence of the SLC in *Scalisi* is unavailing. The relevant discussion in *Mills* is contained in a footnote that merely mentions that the two SLC members earlier moved to dismiss plaintiffs' original complaint and that the motion, made on Rule 23.1 grounds, "did not manifest any prejudgment of the merits of this case." *Mills*, 544 F. Supp. at 1283 n.5.

[95] *Kaplan*, 484 A.2d 501.

[96] *Katell*, 1995 WL 376952.

[97] 2003 WL 21453879 (Del. Ch. May 30, 2003).

[98] 27 F. Supp. 2d 442 (S.D.N.Y. 1998).

[99] The plaintiff in *Kindt* did not challenge the independences of the SLC.

The SLC in *Kaplan* consisted of two members, Marshall and Holliday. Neither Marshall nor Holliday were named as defendants in the lawsuit. The plaintiff did not challenge the independence of Holliday, who died after filing the SLC's report. Instead, plaintiff focused primarily on the claimed independence of Marshall, who was a director at the time of the events complained of, and the SLC's legal counsel. The plaintiff articulated seventeen different reasons as to why the motion to dismiss brought by the SLC should be denied.[100] The main thrust of plaintiff's issue with the independence of Marshall was that he was a director who approved of the transaction complained of (even though he was not a named defendant in the action), and that Marshall, along with members of his family, owned stock in companies that had done business with Coastal over the years.[101] Without addressing each reason identified by plaintiff, the Court of Chancery stated that it was "convinced" there were no material facts in dispute, and found that the SLC operated independently.

In *Katell*, the SLC was comprised of one member, a partnership, CIGNA LCF, which was also a defendant in the lawsuit. CIGNA LCF was the only general partner that purportedly did not stand to benefit from the transaction, and therefore, it was authorized by the general partners, and a vote of a majority of the limited partners, to review the merits

---

[100] The Court of Chancery counted "seventeen in number." *Kaplan*, 484 A.2d at 517.

[101] *Id.* at 512–13. The specifics of plaintiff's argument against Marshall regarding his stock ownership are as follows: Marshall, along with members of his family, owned a 9% shareholder interest in a company that had done business with Coastal over the years. Marshall was also a 50% owner of a company (Petco) which acted or had acted as a general partner of limited partnerships in oil and gas exploration programs, of which Coastal had participated in. Finally, Petco owned 38% of a company (IRC), in which plaintiff argued made Marshall, as 50% owner of Petco, a 19% owner of IRC. Coastal and IRC "engaged in past transactions." *Id.* at 513.

24

of the derivative lawsuit. As the only special committee member, CIGNA LCF appointed three employees of its parent corporation, CIGNA, to conduct the business of the SLC. All three employees were part of CIGNA's investment division, and none had been directly involved in CIGNA LCF prior to serving on the SLC. Although the three employees of CIGNA acted as the SLC, the court determined that it was CIGNA LCF's independence, not the three employees' independence, that should be the focus of the analysis.[102] Plaintiffs argued that CIGNA LCF was not only a defendant, but it had, as general partner, approved the challenged transactions. However, the Court of Chancery held that "the undisputed facts put forth by [d]efendants conclusively support CIGNA LCF's independence." Specifically, the court noted that an overwhelming majority of the limited partners approved of CIGNA LCF's appointment as the special committee. Further, CIGNA LCF was in the same economic position as the limited partners during both transactions, and CIGNA LCF did not stand to benefit from the transactions at the expense of the partnership.

Finally, the SLC cites *Strougo ex rel. The Brazil Fund, Inc*. Procedurally, this case is arguably the most analogous to the situation presented here. Without making a prior demand on the board, Strougo filed his complaint, and the directors moved for dismissal, arguing, among other things, that Strougo failed to state a claim and failed to make a pre-suit demand on the board. The court denied the motion against the directors (except for one outside director), and pre-suit demand was held to be excused. The nominal

---

[102] The court stated that the three CIGNA employees "cannot make CIGNA LCF independent if it would not otherwise meet the test for independence." *Katell*, 1995 WL 376952, at *6.

25

defendant's motion to stay all proceedings for three months to permit the SLC to investigate allegations of the lawsuit was granted.[103] The SLC was comprised of two members—one original defendant who was dismissed (DaCosta), and a new director who was added over a year after the complaint was filed.[104] After the SLC investigation, the defendants moved to terminate and dismiss the action based upon the report of the SLC.

The court considered plaintiffs argument that DaCosta was not independent because he had been named as a defendant and had moved to dismiss the complaint. The plaintiffs cited a portion of the defendants' brief in support of that motion to dismiss in an attempt to demonstrate DaCosta's prejudgment. The court rejected that argument by simply stating that a motion to dismiss is designed to test the legal sufficiency of the complaint.[105] There was no discussion or analysis of the substance of the prior motion beyond that.

A motion to dismiss, in and of itself, is not necessarily disqualifying. Rather, the court should examine the substance of the motion, including the nature of the allegations against the directors and whether the corporation has elected to take an active role in the litigation. If the motion to dismiss was authorized by the SLC member or members and challenges the very core issues that the SLC is subsequently charged with investigating, that may be enough to create an issue of fact as to their independence. This requires a case-

---

[103] *Strougo ex rel. The Brazil Fund, Inc.*, 27 F. Supp. 2d at 444.

[104] *See Strougo ex rel. Brazil Fund, Inc. v. Padegs*, 1 F. Supp. 2d 276, 278 (S.D.N.Y. 1998).

[105] *Strougo ex rel. The Brazil Fund, Inc.*, 27 F. Supp. 2d at 449.

by-case determination, and the SLC bears the burden on this issue.[106] I do not think the SLC has met its burden.

Finally, I mention two other points. First, I do not think that *London* changed the standard for determining the independence of an SLC member. I note that the Court of Chancery stated that the SLC Report was "not a 'combative attack' on Plaintiff's claims[,]"[107] and, therefore, did not create a material fact as to Floyd or Lynton's independence. That should not be a new standard in evaluating the independence of SLC members who have previously participated in moving to dismiss claims they are charged with investigating. The standard, rather, is still that they must be "above reproach."

Second, the SLC process is not necessarily unavailable where an entire Board is named in a lawsuit, and then moves to dismiss it. But that is not this case. Here, Lynton and Floyd had a role in authorizing a motion to dismiss claims involving loyalty issues.[108] Not only that, the Company under their managerial direction, took an active role and even the lead role, in challenging the merits of the claims. The thorny issues regarding Floyd's

---

[106] In *Beam*, our Court observed that this procedural fact could be outcome determinative. *See Beam*, 845 A.2d at 1055 ("We need not decide whether the substantive standard of independence in an SLC case differs from that in a presuit demand case. As a practical matter, the procedural distinction relating to the diametrically-opposed burdens and the availability of discovery into independence may be outcome-determinative on the issue of independence.").

[107] *Diep v. Sather*, 2021 WL 3236322, at 16 (Del. Ch. July 30, 2021).

[108] The Majority acknowledges that an important aspect of a board's managerial decision-making role is whether to initiate, or refrain from initiating, litigation on the corporation's behalf. Maj. Op. at 30. Yet the Majority contends that this Board merely attended a board meeting when that motion was discussed. Maj. Op. at 38. In fact, its decision is premised on that tenuous conclusion. That conclusion is inconsistent with the record, with the role of the board, and with the fact that the SLC bears the burden on the independence issue. After all, this was not a decision about where to hold the next board meeting. It was a decision about what position the Company should be asserting in court regarding serious loyalty claims asserted against other directors and officers.

and Lynton's independence could have been avoided.  As pointed out by Diep, EPL could have formed an SLC as soon as Diep filed the Complaint in 2016.  EPL, as nominal defendant, could have avoided taking a position on the merits of the substantive issues.  EPL also could have selected or added different directors who were not on the Board when the 2016 Motion was filed, as it did with Babb.

In sum, Diep raised serious loyalty challenges including directors and officers of the Company—challenges centered on insider trading and disclosure claims that survived an initial motion to dismiss.  If the SLC process is to have any sanctity and credibility in dismissing claims simply by having a committee investigate them, the SLC's independence must be above reproach.[109]  Because there is a legitimate factual issue as to Floyd's and Lynton's independence, I respectfully DISSENT.

---

[109] *See* Balotti, *supra* note 46, § 13.17 ("One of the obvious purposes for forming a special litigation committee is to promote confidence in the integrity of corporate decision making by vesting the company's power to respond to accusations of serious misconduct by high officials in an impartial group of independent directors.  By forming a committee whose fairness and objectivity cannot be reasonably questioned, giving them the resources to retain advisors, and granting them the freedom to do a thorough investigation and to pursue claims against wrongdoers, the company can assuage concern among its stockholders and retain, through the SLC, control over any claims belonging to the Company itself." (citing *Biondi*, 820 A.2d at 1156)).  The Majority's questioning of the "above reproach" standard is unfortunate in that, at best, it avoids an opportunity to provide more clear guidance for those involved in the SLC process, and at worst, lowers the "independence" bar as it applies to an already anomalous and unusual procedure whereby defendants can free themselves of serious claims merely by appointing a committee.